CLAYBROOK and others *v.* CITY OF OWENSBORO and others.

(*District Court, D. Kentucky.* 1883.)

1. CONSTITUTIONAL LAW—ACT DISCRIMINATING BETWEEN WHITE AND BLACK IN DISTRIBUTION OF SCHOOL FUND IS VOID.

An act of a state legislature authorizing a municipal corporation to levy a tax for the benefit of public schools within its limits, but directing that the tax collected of the white people should be used to sustain public schools for white children only, and the tax collected of the colored people should be used to sustain schools for colored children, the effect of such discrimination being to give the whites excellent school facilities and a school session annually of nine

months, and the colored, inferior school facilities and a session of three months, is contrary to the fourteenth amendment of the United States constitution, and void. The colored race is entitled to have a fair share of the fund raised by such taxation applied to the maintenance of the colored schools.

2. INJUNCTION FROM UNITED STATES COURTS AGAINST UNCONSTITUTIONAL STATE LAW.

The federal courts have jurisdiction to enjoin state officers from obeying state laws declared unconstitutional.

Motion for Injunction.

E. W. Bagby and C. S. Marshall, for complainants.

Owen & Ellis and W. N. Sweeney, for defendants.

BARR, J. The complainants allege that they are citizens of the United States and of the state of Kentucky, of African descent, and are residents of the city of Owensboro, and are being deprived by defendants of the equal protection of the law, in that they are discriminated against in the distribution of taxes levied by the city of Owensboro for the public schools of said city, and they ask an injunction against "the board of trustees of the Owensboro public schools" and its treasurer, restaining them from this alleged discrimination in the distribution of these taxes. The general assembly of Kentucky has, by separate enactments, one in 1871 and the other in 1880, authorized the mayor and common council of the city of Owensboro to assess and levy an ad valorem tax, not exceeding thirty (30) cents on each one hundred (100) dollars' worth of property in said city, and a poll tax not exceeding two dollars on each resident of said city over 21 years of age. This tax, when collected, was to be applied to sustaining the public schools of said city. The taxes collected of the white people and on their property are to be used in establishing and sustaining public schools for white children only, and the taxes collected of colored people and on their property to be used in sustaining public schools for colored children. The city of Owensboro has, as required by these laws, assessed and levied these taxes—an ad valorem tax of 30 cents on each $100 worth of property and two dollars poll tax—separately, and they are being separately applied to the white and colored schools, as required by the state statutes.

The state also authorized the city of Owensboro to issue $30,000 of its bonds, and apply the proceeds of the sale thereof to the building of public school-houses in said city, to be used exclusively by white children. This law provides that only white people and their property should be taxed to pay these bonds and the accruing interest thereon. The city of Owensboro has, under authority of this

law, issued $30,000 of its bonds, and applied the proceeds thereof to the building of two common school-houses, and now uses these school-houses for white children exclusively.

In obedience to the provisions of the state statutes, there are two school systems in said city. The public schools for white children are managed by a board of white trustees, elected by the white voters in said city. The public schools for colored children, which are entirely separate, are managed by colored men selected by the common council of the city. It appears from the affidavits that there are about 500 colored children within the school age and about 800 white children within that age in the city. The taxes assessed for last year upon the white people and their property amounted to about $9,400, and those assessed upon the colored people and their property amounted to about $770. The practical result of this discrimination against the colored children in the distribution of the school fund raised by taxation has been to give the white children two excellent school-houses, excellent school facilities, 18 teachers, and a school session of 9 or 10 months in each year. On the other hand, the colored children have only one inferior school-house, three teachers, school facilities of every kind very inferior to those of the white children, and a school session of about three months in each year.

The learned counsel for defendants admits that these laws, and the action of the authorities under them, have and will continue to produce inequality in educational advantages between the white and the colored children in Owensboro, but insists (1) that this is a lawful inequality; (2) if it is not a lawful one, this court has no jurisdiction. They insist the taxes assessed and levied under these laws are not for the purpose of sustaining *common* schools, but these acts make the white residents and the colored residents of Owensboro two separate corporations, with power and authority to establish *public* schools for the children of each race, and that the right to tax is merely a mode of assessing the members of the respective corporations as stockholders. This is not a correct construction of these laws. The first section of the act approved 1871 declares the city of Owensboro shall be a school-district, and the fourteenth section provides that "all white children over six years of age within each ward shall have equal right of admission to the schools of such ward, and no fees or charges for their tuition shall ever be charged in any of the schools. And it is expressly provided that only white children be admitted to said schools."

The twenty-first section requires that "the commissioner or commissioners for common schools shall annually make one estimate of the shares or proportions of the state common-school fund, which would be coming or due to the school-districts of Owensboro if the boundaries of the city were taken as the boundary of such districts, and shall annually pay over to the treasurer of the board of trustees herein created the full amount of such proportion or share, which shall be held and used by them as other funds herein provided for." It is quite clear that the act of 1871 and the amendments were intended to and do provide for local aid to the *common schools* in Owensboro, and with this local aid was given local control, and that it is really a part of the common-school system of the state, and, as such, getting its part of the common-school fund of the state.

It is equally inaccurate to assert that the white residents of Owensboro are made in any sense stockholders in the corporation established by the act of 1871. All white residents of Owensboro, after this act became a law, were subject to the assessment of taxes by the common council of the city, and this was without regard to their willingness or unwillingness to be taxed. This power of taxation did not rest upon the will of the tax-payer, but continued at the will of the state of Kentucky. The state can tax for the purpose of establishing and sustaining common schools, because that is recognized as a governmental purpose and within the legitimate power of the state. This power was delegated to the city of Owensboro as a municipal corporation, and for convenience a subcorporation called the "Board of Trustees of the Owensboro Public Schools" was created, but neither the residents nor the tax-payers in said city are in any legal sense stockholders in this corporation. If, therefore, the power of the state to prescribe the color or race of the stockholders in a private corporation which it creates be conceded, the existence of such a power would have no application to the case under consideration. The thirteenth amendment to the federal constitution prohibited slavery and involuntary servitude, except for crime, and the fifteenth amendment prohibits the United States or any state from discriminating between citizens as to the right to vote on account of race, color, or previous condition of servitude. It is doubted whether either of these amendments have any direct bearing upon the question under consideration, since the discrimination which is prohibited by the fifteenth amendment is only as to the right to vote, and educational advantages are not indispensable to the enjoyment of free-

dom or citizenship, however necessary they may be to the perpetuity of free institutions.    These amendments, however, indicate the intention of this nation in regard to those who had been slaves and were of the African race, and, when taken with the history of their adoption, aid in arriving at a correct construction of the first section of the fourteenth amendment, which declares:

"All persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the state wherein they reside.   No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

This section gives a citizen of the United States or of a state, and even persons who are not citizens, an additional guaranty of the enjoyment of their fundamental rights.    This guaranty is not against individual action or encroachment, but against the state, and its laws and its officers.    These rights of the citizen are still to be protected and enforced, as between man and man, by and through state laws and agencies, and not by the United States and its laws.    *Virginia* v. *Rives,* 100 U. S. 313; *U. S.* v. *Harris,* 106 U. S. 629; [S. C. 1 Sup. Ct. Rep. 601;] *Le Grand* v. *U. S.* 12 FED. REP. 577.

Heretofore the citizen looked alone to the constitution of his state for a guaranty of these fundamental rights.    That guaranty was then liable to be modified, or, indeed, destroyed by the will of an all-powerful state majority; but now the citizen has the nation's guaranty of these rights, which are fundamental, and "belong of right to citizens of all free governments," even against the action of the largest majority in a state.    This guaranty has rounded out and perfected our government, and will be a priceless heritage to posterity long after the race in whose behalf it was adopted has ceased to need its especial protection.

Waiving all consideration of the question as to the rights of complainants as citizens of the United States, we proceed to inquire whether the act of 1871 and its amendments deny to complainants "the equal protection of the laws" within the meaning of this section. It may be argued that the equal protection of the laws does not mean the equal benefit of the laws; that protection in this section does not mean benefit; and that the inequality here is only in the benefits arising from the laws.    Perhaps the best way to test the soundness of this distinction, as applied to the laws of a state, would be to im-

agine the distinction a good one and see where it would lead.    Thus, if protection only means equal taxation, and not the equal benefits of the taxes when levied and collected for governmental purposes, the state may apply such taxes not only according to color, but also according to the nativity of the citizen.    Thus taxes levied and collected for police purposes, for the administration of justice, for the enforcement of criminal laws, and, indeed, for any other governmental purpose, may be distributed by the color line, or, as between white people, according to their places of birth, in proportion as taxes may be paid by each class.    If taxes can be distributed according to color or race classification, no good reason is perceived why a division might not be made according to the amount paid by each taxpayer, and thus limit the benefits and distribute the protection of the laws by a classification based upon the wealth of the tax-payers. Such distribution of taxes would entirely ignore the spirit of our republican institutions, and would not be the equal protection of the laws as understood by the people of any of the states of this Union at the time of the adoption of this amendment.    The equal protection of the laws is not possible if the taxes levied and collected for governmental purposes are divided upon any such basis.

The equal protection of the laws guarantied by this amendment must and can only mean that the laws of the states must be equal in their benefit as well as equal in their burdens, and that less would not be "the equal protection of the laws."    This does not mean absolute equality in distributing the benefits of taxation.    This is impracticable; but it does mean the distribution of the benefits upon some fair and equal classification or basis.    See *Virginia v. Rives,* 100 U. S. 313; *Ex parte Virginia,* Id. 339; *Strauder v. West Virginia,* Id. 303; *Neal v. Delaware,* 103 U. S. 370; *Bertonneau v. Directors, etc.,* 3 Wood, 177; *U. S. v. Buntin,* 10 FED. REP. 730; Cooley, Torts, 289; *Ward v. Flood,* 48 Cal. 36; *Smith v. Directors Ind. School-dist., etc.,* 40 Iowa, 518; *Roberts v. Boston,* 5 Cush. 198; *State v. McCann,* 21 Ohio St. 198; *Cory v. Carter,* 48 Ind. 362; *Ah Kow v. Nunan,* 5 Sawy. 555; *Parrott's Chinese Case,* 6 Sawy. 376.

The supreme court, in *Strauder v. West Virginia, supra,* in considering this amendment, uses this language:

"It ordains that no state shall deprive any person of life, liberty, or property without due process of law, or deny to any person within its jurisdiction the equal protection of the law.    What is this but declaring that the law in the states shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the states; and

in regard to the colored race, for whose protection the amendments were primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity or right most valuable to the colored race—the right to exemption from unfriendly legislation against them distinctively as colored, exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race."

In *Ward* v. *Flood*, 48 Cal. 51, the supreme court of that state, in discussing this school question, says:

" The clause of the fourteenth amendment referred to did not create any new or substantive legal right, or add to or enlarge the general classification of the rights of persons or things existing in many states under the laws thereof. It, however, operated upon them as it found them already established, and it declared in substance that such as they were in such state, they should be held and enjoyed alike by all persons within its jurisdiction. The protection of law is, indeed, inseparable from the assumed existence of a recognized legal right, through the vindication of which the protection is to operate. To declare, then, that each person within the jurisdiction of the state shall enjoy the equal protection of its laws, is necessarily to declare that the measure of legal rights within the state shall be equal and uniform, and the same for all persons found therein, according to the respective conditions of each—each child as to all other children, each adult person as to all other adult persons."

The act of 1871 and amendments, in so far as they confer the benefit of the taxes raised thereunder exclusively upon white children, is within the inhibition of the first section of the fourteenth amendment to the constitution of the United States, and therefore void.

In arriving at this conclusion I have assumed that Kentucky, in establishing and maintaining a common-school system, is exercising a governmental function, and that this school system is not a public charity which can be given to some and withheld from others, but that the state of Kentucky, having a right to tax for this purpose because, and only because, it is for a governmental purpose, must give to all of its people the equal benefit and protection of these laws, as well as others. The judiciary act of March, 1875, gives the United States courts jurisdiction concurrently with the state courts of all suits of a civil nature, at common law or equity, when the matter in dispute exceeds $500, and arises under the constitution or laws of the United States. See, also, section 629, subs. 16, Rev. St.

As this case involves a controversy exceeding $500 in value, and arises under the constitution of the United States, this court has

jurisdiction, if the suit has been properly brought in equity. The complainants complain of an illegal discrimination against them and others of their race, in virtue and under the authority of an unconstitutional act of the general assembly of Kentucky. They do not seek admission for themselves and others of their race into the schools established for white children exclusively. The trustees of the schools provided for colored children residing in Owensboro cannot sue for the share of the colored children in this fund, because the state of Kentucky has given them no such authority. It may be said that each colored child of a school age in the city of Owensboro may sue at law for his or her share of this fund, but this is not true, as they have no undivided share. If I am correct in my conclusion, all that colored children in Owensboro are entitled to is the equal protection of the laws, in that a fair share of this fund be applied toward the maintenance of the common schools especially provided for colored children. In this view the only remedy is in equity.

The federal courts are prohibited from enjoining any proceeding in a state court, (section 720, Rev. St.,) but there is no other legislative prohibition against the issuing of the writ of injunction. Circuit and district courts of the United States are expressly given power to issue all writs which may be necessary for the exercise of their respective jurisdiction, and agreeable to usages and principles of law. Section 716, Rev. St.

This court should always be most careful in exercising its jurisdiction, if thereby it interferes with the action of those claiming to act under the authority of a state law. But if the jurisdiction be undoubted, and justice and the rights of parties demand such an exercise, it must be done in obedience to the supreme law.

United States courts have heretofore enjoined state officers from obeying state laws which were declared to be unconstitutional. Thus, in *Osborn* v. *Bank of U. S.* 9 Wheat. 738, the supreme court approved of an order of injunction against state officers acting under a state statute which was declared to be unconstitutional. In *Davis* v. *Gray*, 16 Wall. 205, the same court sustained an injunction suit against the governor and land commissioner of Texas. In *Board of Liquidation* v. *McComb*, 92 U. S. 532, the board of liquidation was enjoined from funding certain bonds into the kind held by complainants, because it was injurious to his interest and in violation of a contract which the state of Louisiana had made with certain of her bondholders. See, also, *U. S.* v. *Lee*, 106 U. S. 196; [S. C. 1 Sup. Ct. Rep. 240;]

*Hancock* v. *Walsh,* 3 Wood, 351; *Bertonneau* v. *Board of Directors City Schools,* Id. 177; *Evansville Nat. Bank* v. *Britton,* 8 FED. REP. 867.

The complainant may have an injunction until further order of the court.