## MILLS v. LOWNDES et al.
### No. 56.

District Court, D. Maryland.
March 1, 1939.

## SWANSON v. NORTHERN PAC. RY. CO.
### No. 904.

District Court, D. Montana, Butte Division.
Dec. 5, 1938.

794

Thurgood Marshall, of Baltimore, Md., and Charles H. Houston, Leon Ransom Edward P. Lovett, all of Washington, D. C., for plaintiff.

William C. Walsh, Atty. Gen., and Charles T. LeViness, III, Asst. Atty. Gen., for defendants.

CHESNUT, District Judge.

The object of this action is to accomplish, if possible, an equalization of the salaries paid to white and colored teachers in the public schools of Maryland. The plaintiff is a colored school teacher who is employed and paid by the County School Board of Anne Arundel County, Maryland. His complaint alleges that for many years past in this State only white teachers are employed to teach in schools for white children and only colored teachers in the schools for colored children; and that in most of the Counties of the State, including Anne Arundel County, the salaries paid colored teachers in colored schools are materially less than the amounts paid white teachers in white schools although having equal professional qualifications. He calls attention to a Maryland statute which provides the *minimum* scale of salaries for white teachers, graduated to professional qualifications and years of experience, and a separate statute providing a lower *minimum* for teachers in colored schools; and alleges that in practical application colored school teachers are paid less than white teachers solely on account of their race and color. He contends that this constitutes an unconstitutional discrimination which is

prohibited by the equal protection clause of section 1 of the Fourteenth Amendment to the Federal Constitution, U.S.C.A.

To redress this grievance on behalf of himself and others of his race in the same class he has filed this suit, not against the County Board by which he is employed, but against the State Board of Education, the State Superintendent of Education and the Treasurer and Comptroller of the State, all general State officers. In Maryland since 1865 the County has been the unit for most local governmental functions including that of public education. The principal questions—and they are important ones—which arise in the case are (1) whether the statutes either on their face or in their practical application are contrary to the Fourteenth Amendment; (2) whether the plaintiff has a sufficient status to raise the question; (3) whether the relief prayed for, an injunction against the enforcement of the law or practice thereunder by the general state officers, can be maintained in the absence from the record of the local County Board as a defendant, and (4) if so, is the remedy by injunction, which is the only relief sought, proper in this case.[1]

The defendants have appeared by the Attorney General of the State and moved to dismiss the complaint on the ground that it does not state a sufficient cause of action to justify the relief sought. Ordinarily it is not advisable to determine constitutional and procedural questions of such gravity without a full hearing on the facts (Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 211–213, 55 S.Ct. 187, 79 L.Ed. 281; Polk Co. v. Glover, 305 U.S. 5, 59 S.Ct. 15, 83 L.Ed. ——, Nov. 7, 1938); but the factual situation is very fully developed in the plaintiff's complaint and the case has been very fully argued by counsel, and in addition to the allegations of the complaint there has been developed in argument other facts and conditions which are not in dispute and which therefore may be taken as conceded in connec-

tion with the averments of the complaint. As it is apparent that both parties desire a prompt disposition of the case on its legal merits, I will therefore now proceed to state my conclusions arising on the motion to dismiss.

It is essential to a considered opinion on the questions presented to first have a precise understanding of the Maryland statutory scheme of elementary education. It is sufficient in this case to state the controlling fundamentals without the unimportant details. The State Constitution of 1867, Art. 8, § 1, provides: "The General Assembly, at its first session after the adoption of this Constitution, shall, by law, establish throughout the State a thorough and efficient system of free Public Schools; and shall provide by taxation or otherwise, for their maintenance." The statutes of the State passed pursuant thereto and now in force are to be found in Article 77, of the Maryland Code of 1924, and supplement thereto of 1935, section 1 of which provides: "There shall be throughout the State of Maryland a general system of free public schools, according to the provisions of this article." Since 1865 it has been the uniform policy and practice of the State to provide separate schools for white and colored children. The governmental subdivisions of the State consist of twenty-three counties and Baltimore City. These sub-divisions are respectively made the units for providing and maintaining free public education. In each County and in Baltimore City there is a local Board of Education sometimes called School Commissioners, on whom the statutes confer the authority and the duty to provide and maintain the schools and, in conjunction with the County Commissioners, to raise the necessary public funds by taxation to pay the expenses thereof, supplemented to some extent by general state school funds. Successive statutes up to and including the one now in force provide that the salaries of teachers in the City and Counties shall be fixed by the Board of School Commissioners of the City and the several Counties.

---

[1] As the plaintiff has not prayed for an interlocutory injunction a three-judge court was not authorized by United States Code, Title 28, § 380, 28 U.S.C.A. § 380. Stratton v. St. Louis Southwestern Ry. Co., 282 U.S. 10, 51 S.Ct. 8, 75 L.Ed. 135; McCart v. Indianapolis Water Co., 302 U.S. 419, 58 S.Ct. 324, 82 L.Ed. 336.

The jurisdiction of the court in this case is based on United States Code, Title 28, § 41(1) and (14), 28 U.S.C.A. § 41(1, 14). No objection to the jurisdiction has been raised by the defendants except insofar as the general ground of the motion to dismiss can properly include the immunity of the State from suit under the Eleventh Amendment, U.S.C.A., if that defense has not been waived by the mere general grounds of the motion.

Section 3 of Article 77 provides that "educational matters affecting a County shall be under the control of a County Board of Education".[2] Sections 1 and 9 to 26, inclusive, also provide for and outline the duties of the State Board of Education for which the State Superintendent of Schools shall act as the chief executive officer. The State Board is authorized to determine the educational policy of the State, including the establishment of standards and determination and certification of the qualifications of teachers and conditions for the hygienic and sanitary construction of school buildings; but it has no power to select or employ or fix the salaries of the teachers, which function is committed solely to the County Boards.

The primary fund necessary for the maintenance of the schools in the several Counties and Baltimore City is raised by specific taxation of property in the City and Counties for that purpose but supplemental appropriations are made from state taxes levied for education, and distributed to the several Counties in accordance with section 204 of Art. 77.

The major portion of the State school funds are apportioned among the Counties on the basis of school census and aggregate days of attendance; but experience demonstrated that even with this State aid, many of the Counties, by reason of their comparatively low tax assessable basis, were unable to meet the minimum program of educational requirements, including the minimum salary schedule provided for by statute; and to enable these poorer counties to comply with this minimum program a special additional state fund was provided for the first time in 1922, called the Equalization Fund. It is with respect to the distribution of this fund to the several Counties that counsel for the plaintiff submit their principal contention for the maintenance of this suit without making the County Board of Education of Anne Arundel County a party hereto, and for the propriety of granting the injunctive relief asked for.

The nature and operation of this special fund is disclosed by Sec. 204 of Art. 77, as amended by the Act of 1933, Ch. 261, to be found in the 1935 Supp. to the Maryland Code. It is provided that from the general state school fund (when biennially appropriated by the General Assembly) the Comptroller shall distribute to certain Counties: "such special appropriations to be known as an Equalization Fund as may from time to time, be made by Budget Bill or Supplementary Appropriations Bill, to the county boards of education of certain counties to enable them to pay the minimum salaries prescribed in this Article for county superintendents, supervising teachers and helping teachers, high school and elementary school teachers, and teachers in colored schools * * *; provided, that said board of county commissioners of each of the several counties sharing in the Equalization Fund shall levy and collect an annual tax for the schools of not less than forty-seven (47) cents on each one hundred

[2] See Act of 1865, Ch. 160, Title 2, Ch. 4, § 5; Act of 1872, Ch. 377, Ch. 8, § 6; Ch. 4, § 4; Act of 1904, Ch. 584, § 53. The present statute is to be found in Art. 77 of the Maryland Code, § 56.

The earliest statutory provision for schools for colored children appeared in the Act of 1865, Ch. 160, Title 4, Ch. 1, §§ 1, 2. See also the following Acts of Assembly: 1870, Ch. 311, § 18; 1872, Ch. 377, Ch. 18, §§ 1-4; 1904, Ch. 584, §§ 96 & 98; 1916, Ch. 506, § 131; 1922, Ch. 382, § 131. The present statutes are to be found in Article 77, §§ 200 to 203, and the Act of 1937, Ch. 552.

One of the first Maryland statutes providing for a minimum salary for white school teachers was the Act of 1908, Ch. 635, § 122½(e). The County Commissioners of Worcester County refused to levy the necessary additional taxes to pay these minimum salaries and thereupon the County School Board filed a mandamus petition to require them to do so. Judge Urner for the Maryland Court of Appeals in the case of Worcester County Com'rs v. School Commissioners, 113 Md. 305, 312, 77 A. 605, 607, said: "The board of county school commissioners, who are charged with the control of all educational matters affecting their county (Code, art. 77, §§ 3 and 24), and to whom the proceeds of school taxes are payable (Ib., art. 77, § 25), are the proper parties to demand the performance by the county commissioners of their duty under the law in this connection."

The control of education in Baltimore City is similar to that in the Counties. As to the power and authority of the School Board of Baltimore City with respect to fixing salaries of teachers, see Thomas v. Field, 143 Md. 128, 129, 122 A. 25 (where an effort was made to require the Board to equalize the salaries of white and colored teachers), and Graham v. Joyce, 151 Md. 298, 134 A. 332.

dollars ($100) of assessable property * * *; and provided, further, that the county board of education in each of the several counties sharing in the Equalization Fund shall expend no less than twenty-four per centum (24%) of the total budget, not including costs of transportation as authorized in this section, debt service and capital outlay, for purposes other than teachers' salaries."

The effect is that if the amount of County School taxes at the rate of forty-seven cents per one hundred dollars of assessable county property, together with the apportionments of the general school fund on the basis of census and school attendance, is not sufficient to meet the county school expenses, including the minimum salary schedules, then the deficiency therein to that extent shall be paid to such counties from the Equalization Fund.[3] There is no restriction on the counties to fix salaries at rates higher than the minimum, and to pay them from an additional tax rate, and some of the Counties have equalized the

salaries of all teachers of the same grade. Prior to 1904 there was no restriction on the absolute discretion of the County Boards in fixing the amount of salaries for teachers. By the Act of 1904, Ch. 584, § 53, $300 per year minimum was set for white teachers. For teachers in the colored schools a minimum of $210 was first provided by the Act of 1918, Ch. 81. By amendatory statutes these minima have been successively raised until at the present time the minimum amount for teachers in white elementary schools, graduated in accordance with professional qualifications and years of experience, ranges from $600 for a teacher holding a third grade certificate of one to three years' experience, to $1,750 for a school principal with nine assistants, of more than nine years' experience; and for teachers in colored schools the range is from $360 to $1,170.[4]

From this outline of the relevant statutes it is, for the purposes of this case, importantly to be noted (1) that the County is the unit for educational purposes; (2) that

---

[3] The nature and function of the Equalization Fund in the Maryland system of public education is described at length in the Maryland School Bulletin for September 1930, issued by the State Department of Education, Baltimore, Maryland entitled "Equalizing Educational Opportunities in Maryland through a Minimum Program and an Equalization Fund". The Bulletin of 77 printed pages explains fully the purpose of the Equalization Fund and the results of its operation over a period of about eight years. It is stated that the result of the functioning of the Fund has been to materially increase the efficiency of both teachers and pupils as demonstrated by the included statistics. In the foreword to the Bulletin there is quoted from the United States Bureau of Education Bulletin, 1928, No. 28, p. 158 (by Fletcher Harper Smith and Bruce Lewis Zimmerman) the following:

"Maryland enjoys the distinction of being one of the few States in the Union which has worked out a scheme of financing public schools which, in a sound and relatively satisfactory way, equalizes school burdens, revenues and consequently, educational opportunities. It will be helpful to summarize at the outset the outstanding features of the Maryland system of school support. These include the following: (1) The organization of the school system on the basis of the county unit; (2) requiring from every county the submission of a budget showing the cost of providing a minimum school pro-

gram; (3) an assured fund from State and county sources sufficient to meet the costs submitted by the county and approved by State authorities; (4) a State minimum-salary scale graduated to professional qualifications and experience of teachers; (5) liberal State appropriations available to all counties regardless of wealth; (6) the apportionment of the major portion of State funds upon the basis of school census and aggregate days of attendance; (7) provision of a State equalization fund available to every county which levies a county school tax of a minimum rate fixed by law (6.7 mills) and is unable to finance from all other State and County funds its minimum State-approved program; (8) the computation of the total county school budget on the theory that teachers' salaries should constitute not more than 76 per cent of the total current costs."

It appears in the 71st Annual Report of the State Board of Education for the year ending July 31, 1937 (pages 298, 218) that for that year the total Equalization Fund for all Counties amounted to $490,871.43, of which amount $31,143.10 was distributed to Anne Arundel County, where the plaintiff is employed. In the same year that County raised for current school expenses from the County levy and other County sources, $354,484. The total State funds received by it for that year amounted to $217,987.28.

[4] See Plaintiff's Exhibit "A", and Act of 1937, Ch. 552.

the County Boards have full authority and discretion in the selection of teachers and the determination of the amount of salary to be paid them, subject only to the minimum requirements of the statutes; (3) that the Equalization Fund is apportioned among the Counties on the basis of County wealth and for the purpose of enabling the poorer counties to meet at least the minimum educational requirements and thus to make it possible for them to maintain approximately the same minimum standards for elementary education that prevail in the richer counties; (4) that each County Board of Education is at liberty, in co-operation with the County Commissioners, to pay to its school teachers salaries in excess of the minimum if the county rate of school taxation is increased above forty-seven cents per hundred dollars of assessable property, and (5) that the apportionment of the Equalization Fund is not made on any condition to the contrary. It was also agreed upon the argument of the case that in Baltimore City and in nine of the twenty-three counties, the salary schedule for white and colored teachers had in recent years been equalized; and that four of these nine counties also participate in the distribution of the Equalization Fund. In other words, it is clear that the Equalization Fund tends to help and not to deter the counties in equalizing the salaries of white and colored teachers.

*Are the Maryland statutes unconstitutional as to the plaintiff?* Counsel for the plaintiff forcibly argues that the statutes on their face, or at least in their practical application, are so clearly unconstitutional that the matter is hardly debatable, and for the defendants, the Attorney General, while asserting generally the validity of the statutes, has put the emphasis of his argument on the propositions that the plaintiff's status is not sufficient to entitle him to maintain the suit, and that the relief prayed for should not be granted because it would be futile and ineffective to benefit him, and would constitute an unnecessary and unwarrantable interference with the activities of the State regarding the distribution of its own school funds among the counties.

The plaintiff takes his stand on the last clause of section 1 of the Fourteenth Amendment to the Federal Constitution, U. S.C.A., which reads:

"No State shall * * * deny to any person within its jurisdiction the equal protection of the laws."

It is well known history that the Thirteenth, Fourteenth and Fifteenth Amendments emerged from the crucible of a civil war as a result of which the former slavery of the Negro race in the United States was abolished; and the primary purpose, although not the whole result, of the Fourteenth Amendment was to protect the members of this race from hostile and discriminatory legislation with respect to their *civil* and *personal* rights as national and state citizens. The broad language of the Amendment, which includes "any person within the jurisdiction of the State" from the denial of equal protection of the laws, necessarily includes others than the members of this race within its protection, but with that aspect of the Amendment we are not here concerned. The Amendment did not of itself create any additional rights in citizens of a state, but by its negative force precludes the state from denying the equal protection of the laws, with respect to both burdens and benefits, to any citizen or class of citizens. And the power of Congress to pass legislation to enforce the Amendment was limited to laws of a nature adapted to correct wrongful state action. The Slaughter House Cases, 16 Wall. 36, 21 L.Ed. 394; Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664; Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667; Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676; Civil Rights Cases, 109 U.S. 3, 3 S. Ct. 18, 27 L.Ed. 835; Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; Buchanan v. Warley, 245 U.S. 60, 76, 38 S.Ct. 16, 62 L.Ed. 149, L.R.A.1918C, 210, Ann.Cas.1918A, 1201. The effect of the Amendment as particularly applicable to this case is well summarized by Mr. Justice Harlan for the Supreme Court in Gibson v. Mississippi, 162 U.S. 565, 591, 16 S.Ct. 904, 910, 40 L.Ed. 1075, as follows: "Underlying all of those decisions is the principle that the constitution of the United States, in its present form, forbids, so far as civil and political rights are concerned, discrimination by the general government, or by the states, against any citizen because of his race. All citizens are equal before the law. The guaranties of life, liberty and property are for all persons, within the jurisdiction of the United States, or of any state, without discrimination against

any because of their race. Those guaranties, when their violation is properly presented in the regular course of proceedings, must be enforced in the courts, both of the nation and of the state, without reference to considerations based upon race."

█ The application of the Amendment in the matter of free public education by the State with respect to the white and colored races was soon made by judicial decisions, both federal and state. It shortly became the established law that where the State adopts the policy of free education, with the segregation of the races in separate schools, the facilities afforded each race therefor must be equal. And this principle has been uniformly adhered to by all federal and state courts, and has been conspicuously illustrated in two recent cases involving the admission of Negro law students to state conducted law schools. In University of Maryland v. Murray, 169 Md. 478, 182 A. 590, it was said for the Court of Appeals of Maryland by Chief Judge Bond, at page 483, 182 A. at page 592: "As a result of the adoption of the Fourteenth Amendment to the United States Constitution, a state is required to extend to its citizens of the two races substantially equal treatment in the facilities it provides from the public funds. 'It is justly held by the authorities that "to single out a certain portion of the people by the arbitrary standard of color, and say that these shall not have rights, which are possessed by others, denies them the equal protection of the laws." * * * Such a course would be manifestly in violation of the fourteenth amendment, because it would deprive a class of persons of a right which the constitution of the state had declared that they should possess.' Clark v. Maryland Institute, 87 Md. 643, 661, 41 A. 126, 129."

And in Missouri v. Canada, 59 S.Ct. 232,

236, 83 L.Ed. ——, December 12, 1938, Chief Justice Hughes said: "The admissibility of laws separating the races in the enjoyment of privileges by the State rests wholly upon the equality of the privileges which the laws give to the separated groups within the State."[5]

█ We are, however, not concerned in this case with an alleged inequality of the white and colored schools of the State, because no such issue is raised by the plaintiff's complaint, which, on the contrary, alleges that the qualifications of the colored school teachers are equal to those of white teachers of the same grade. The case presented here is not inequality of the Maryland schools for the scholars but inequality of pay for the teachers. In this respect it is said that the Maryland statutes are unique in that while there is prevailing inequality of pay between white and colored teachers in nineteen States, Maryland is the only State which has a statute containing a *minimum* salary scale for white teachers, with a lower *minimum* for teachers in colored schools. The statutory discrimination is not expressly made between white and colored teachers, but between white teachers and teachers (whether white or colored) in colored schools. On the face of the statute the discrimination is thus based not on the race or color of the teachers but on the color of the scholars. The definite statutory difference suggests the possibility of two alternatives; either the inequality of the schools for the scholars, resulting from the inequality of professional attainments of the teachers, or the inequality of the pay for the teachers, if of equal qualifications. The historical development of the statutes affords some indication that in origin the difference was attributable to inequality of pedagogical qualifications of the colored teachers.[6] But

---

5 See, also, Williams v. Zimmerman, 172 Md. 563, 192 A. 353; Plessy v. Ferguson, 163 U.S. 537, 544, 16 S.Ct. 1138, 41 L.Ed. 256; 2 Cooley on Torts, p. 215; 45 Yale Law Journal 1296. Early cases announcing the principle are United States v. Buntin, C.C., 10 F. 730, and extensive annotations beginning at page 746; Claybrook v. City of Owensboro, D.C., 16 F. 297; Id., C.C., 23 F. 634; Davenport v. Cloverport, D.C., 72 F. 689; Ward v. Flood, 48 Cal. 36, 17 Am.Rep. 405; State v. Duffy, 7 Nev. 342, 8 Am. Rep. 713; Hall v. De Cuir, 95 U.S. 485, 504, 24 L.Ed. 517.

6 Apparently the first Maryland statute prescribing a minimum salary for white teachers was the Act of 1904, Ch. 584, § 53. At that time there seems to have been no State Normal School for the instruction and practice of colored teachers in the science of education. In the Act of 1908, Ch. 599, it was recited:

"Whereas, The State of Maryland has for many years appropriated large sums of money for the free education of colored children with a view to improving the condition of the State by fitting them for the work and responsibilities of citizens; and

for many years now there has been a State Normal School for training colored teachers under the supervision of the State Board of Education (see Art. 77, § 152); and for the purposes of this case, on the motion to dismiss the complaint, its averment that the qualifications of the teachers of the same grade are equal must be accepted as true; and on this postulate the great disparity in the salaries is strikingly suggestive of unjust discrimination.

In considering the question of constitutionality we must also look beyond the face of the statutes themselves to the practical application thereof as alleged in the complaint. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. It is alleged not only that the teachers are in fact equal, but that the discrimination in pay is solely on account of race and color. This must also be accepted as true for the purposes of the present motion. If the County Board of Education, which has the responsibility for determining the teachers' pay, were a party to the case, it, of course, would have the opportunity, if desired, to answer these allegations and submit the matter for determination on the facts.

The Attorney General contends that the plaintiff does not have a proper status to raise the question of constitutionality because he is an *employe* of the County Board who has voluntarily accepted employment on stated terms. In his complaint the plaintiff has described his status as follows:

"Plaintiff, Walter Mills, is colored, a person of African descent and of Negro blood. Plaintiff has completed the course of instruction offered at Bowie State Normal School, a state normal school maintained and operated by the defendant State Board of Education for the instruction of Negro teachers for the public schools of Maryland. He holds a first grade teacher's certificate issued by the State Board of Education of Maryland and also a principal's certificate issued by said State Board of Education of Maryland. He is now in his tenth year of teaching experience in the public schools of the State of Maryland. Plaintiff at the present time is employed as a principal of a public elementary school for colored children in Anne Arundel County in the State of Maryland subject to the rules, regulations and control of the defendants, the State Board of Education and the State Superintendent of Schools as will be set forth more fully hereafter. Anne Arundel County participates in the "Equalization Fund" of the State of Maryland provided by Section 204 of Article 77 of the Code of Laws of Maryland and pursuant to this Statute and Sections 90, 195, 202 and 203 of said Article 77 plaintiff is paid less salary than the minimum salary required to be paid and actually paid to white principals of elementary schools in the State of Maryland as will hereinafter more fully appear."

Whether a *public employe as such* is entitled to invoke the equal protection clause of the Fourteenth Amendment is a question on which there is little available judicial authority, and there seems to be no reported case in which a public school teacher of any class has heretofore invoked this federal constitutional provision. In legal theory at least schools are maintained for the benefit of school children and not for the benefit of teachers. Counsel stated that they have been unable to find any authority on the point and an independent search has met with no greater success. In view of the fact that the Amendment has been in force for 75 years, the absence of authority on the point is itself rather significant in its indication that it has not heretofore been thought the Amendment applied to such a case. In 1923 before the School Board of Baltimore City had voluntarily equalized the pay of white and colored teachers, an unsuccessful effort was made to require them to do so, by a mandamus petition. Thomas v. Field, 143 Md. 128, 122 A. 25. The suit was brought not by school teachers but by citizens and taxpayers. The plaintiffs in that case based their contention on a provision in the ordinance of estimates, and not on the Fourteenth Amendment. The equal protection clause includes women as well as

---

"Whereas, This endeavor of the State has not met with entire success, largely because of the inability of the school authorities of the State to secure the services of a sufficient number of trained and competent colored teachers". Thereupon the Act established a State Normal School for colored teachers.

The length of the scholastic year for colored schools has until recently been less than that for white schools. See Acts of 1904, Ch. 584, § 96; 1916, Ch. 506, § 131; 1922, Ch. 382, § 131; 1937, Ch. 552.

men. Carrithers v. Shelbyville, 126 Ky. 769, 104 S.W. 744, 17 L.R.A.,N.S., 421. It is well known in this State that for many years there was an unequal salary schedule for school teachers unfavorable to women as compared with men, until the Act of 1924, Ch. 233 (Art. 77, § 91) prohibited such discrimination on account of sex. It was, however, apparently never contended by the advocates of equal pay for women school teachers that they were entitled thereto by the equal protection clause of the Fourteenth Amendment. That a State officer or employe as such is entitled to invoke the Amendment seems to have been rejected in principle by the Maryland Court of Appeals in the case of Herbert v. Baltimore County Com'rs, 97 Md. 639, 643, 55 A. 376, 377, where a state statute had materially reduced the salary or fee schedule of Justices of the Peace in Baltimore County in certain classes of cases, as compared with the official compensation of Justices of the Peace in other counties. The Act was attacked as unequal legislation under the Fourteenth Amendment. In rejecting the proposition the Court said:

"The plaintiff surely has no right to complain so long as he receives such compensation as the state chooses to prescribe. While his office is one which existed at common law, yet our Constitution places it within the power of the Legislature to prescribe his duties and compensation. It would certainly be an extreme and hitherto unheard of extension of the Fourteenth Amendment to hold that by it the state is deprived of the power to say whether a justice of the peace shall receive $10 or $100 per month in criminal cases. It is one thing to prescribe what salary a public officer shall receive for services to be performed, and a different thing to undertake by legislation to deprive him of legal compensation for services already rendered. This act provides only for the former, and so long as the plaintiff, and those who like him, hold the state's commission and authority to act as a justice, he and they must be satisfied with the compensation provided by the Legislature."

The right of the State to prescribe the qualifications for and the salary annexed to a public office of employment is ordinarily free from restriction; and it would not seem that a state employe who has accepted employment at a stated salary could complain that he has been denied a *civil* right under the equal protection clause of the Fourteenth Amendment. However, it is not necessary in this case to decide this precise question because in my opinion there is another aspect of the plaintiff's situation which entitles him to attack the legislation in its practical application. The plaintiff is a qualified school teacher and has the civil right as such to pursue his occupation without discriminatory legislation on account of his race or color. While the State may freely select its employes and determine their compensation it would, in my opinion, be clearly unconstitutional for a state to pass legislation which imposed discriminatory burdens on the colored race with respect to their qualifications for office or prescribe a rate of pay less than that for other classes solely on account of race or color. If therefore the state laws prescribed that colored teachers of equal qualifications with white teachers should receive less compensation on account of their color, such a law would clearly be unconstitutional. It is true the statutes on their face do not have this effect but the complaint alleges that this is the practical application given to the statutes throughout many of the Counties of the State. If so, the discrimination is clearly unlawful. In Simpson v. Geary, D. C., 204 F. 507, 512, Circuit Judge Morrow said: "The right to contract for and retain employment in a given occupation or calling is not a right secured by the Constitution of the United States, nor by any Constitution. It is primarily a natural right, and it is only when a state law regulating such employment discriminates arbitrarily against the equal rights of some class of citizens of the United States, or some class of persons within its jurisdiction, as, for example, on account of race or color, that the civil rights of such persons are invaded, and the protection of the federal Constitution can be invoked to protect the individual in his employment or calling."

I conclude therefore that the plaintiff does have a status, not as a public employe, but as a teacher by occupation, which entitles him to raise the constitutional question; and if the complaint were made against the County Board of Education, which, it is alleged, is making the unjust discrimination between equally qualified white and colored teachers solely on account of their race and color, it would state a case requiring an answer.

But it does not follow that the plaintiff has stated a good cause of action

against *the defendants* named in this case, in the absence of the County Board of Education.

The defendants are all general state officials who are sued in their representative capacity. The relief prayed is an injunction against their enforcement of unconstitutional laws, but the only definite effect of this (and it clearly appeared from the argument that it is the real objective) would be to tie up the Equalization Fund, and prevent its distribution to the Counties who are beneficiaries of the fund. This suit is aimed directly at the moneys of the State now in its treasury. It is therefore in substantial effect a suit against the State prohibited by the Eleventh Amendment U. S.C.A.Const. To avoid this the plaintiff has sought to pattern the procedure on Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann. Cas. 764, and Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283. But on comparison this case bears faint resemblance to those. The principle of Ex parte Young as stated for the Court by Mr. Justice Peckham at pages 155 and 157, 28 S.Ct. at page 452, is:

"The various authorities we have referred to furnish ample justification for the assertion that individuals, who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the State, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action. * * *

"In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party."

See, also, Fitts v. McGhee, 172 U.S. 516, 530, 19 S.Ct. 269, 43 L.Ed. 535; 43 A.L.R. 408.

Therefore to succeed against the defendants here the plaintiff must show not only that the law is unconstitutional but that the defendants have power and authority to enforce it, and are doing so or have threatened to do so to his prejudice. Typical of the doctrine of Ex parte Young

is a suit to enjoin the enforcement of an unconstitutional law, carrying criminal sanctions, by the prosecuting officers of the State. But there is nothing like that here. The complaint does not show a case of even threatened irreparable injury to the plaintiff as a reason for the injunction sought. The plaintiff has a valid written contract with the County. His tenure of office is threatened by no one. He seeks an added benefit rather than the avoidance of a new burden. As to the Equalization Fund, I find nothing that denies to the plaintiff the equal protection of the laws. No question is or could be of itself in this case raised under the State law as to the basis of its apportionment among the Counties. The State is under no obligation, either state or federal, to grant it at all, and when appropriated it may be distributed to the Counties as the Legislature determines. Even uniformity among the Counties is not required by any federal law. State v. Broadbelt, 89 Md. 565, 580, 43 A. 771, 45 L.R.A. 433, 73 Am.St.Rep. 201. It is argued that it is distributed on a discriminatory basis, as between white and colored teachers. but as appears in section 204 of Article 77 it is distributed on the basis of county wealth. The provision is only that if the county tax rate of forty-seven cents does not produce a certain sum the fund will meet the deficit. There is no other condition. None of the defendants have any authority with respect to the fund except to pay it over to the Counties in accordance with the statute. Their power ends there. Nor does the fund when paid to the county operate to the prejudice of the plaintiff. It is an aid and not a hindrance to him. It is argued that when the counties receive the fund they apply it with other school funds to perpetuate the discriminatory minimum salary schedule. But this is the result of the alleged practice and not the command of the statute. The counties have local self government with respect to the teachers, and if their practice denies the equal protection of the laws, theirs is the responsibility, and not the defendants'. Before the fund can properly be withheld from the counties as beneficiaries, they are entitled to be heard as a party to the case. As to the statutes themselves it is clear that it is only the County Boards that have power to enforce them in making the contracts with the teachers. The defendants have no power or authority in this respect. If the counties decide to equalize the teachers' sal-

aries, or pay to either class more than the statutory minimum, the defendants are powerless to restrain them, by suit or otherwise. Possibly if the county should pay less than the statutory minimum the State Board might have power to sue in mandamus under the provision of Art. 77, § 11, in pursuance of its general supervisory duties. But the complaint does not allege any such action is contemplated or threatened. As it is the counties that alone are enforcing the discriminatory schedule relief should be had against them, and not against those who have no authority in the premises. But the complaint neither makes the county a party, nor does it even allege that demand has been made upon the county to desist from the alleged unconstitutional practice.[7]

There is still another reason why this action against general State officers only cannot be maintained in the absence of the County Board of Education. The County is a self-governing unit for elementary education. Subject only to the standard as to minimum efficiency, uniformity is not required in the separate counties. Each County Board in co-operation with the County Commissioners as to the tax rate is free to determine the amount and quality of its educational facilities, and has power to select its teachers and determine their compensation. It may in the exercise of its lawful discretion decide whether to employ white or colored teachers for the colored schools; nor is it required to employ any particular teacher, whether white or colored, although duly qualified. And it may be observed that if the minimum salary schedules are written out of the law as unconstitutional, the local Boards will have unlimited discretion as to the amount to be paid the teachers. In that event doubtless the problem would be handled differently in the respective counties. As has been stated, salaries have been equalized in Baltimore City and nine Counties, four of which still participate in the Equalization Fund. It may also be that some of the Counties have a good defense to the charged discriminatory practice while others have not. To withhold the

Equalization Fund from all alike would be to punish the innocent along with the guilty. From every point of view it is evident that the problem is local and not statewide, and that the remedy of the plaintiff and others of his class is properly against their respective County Boards. Quite possibly the present case has been conceived in the view that one general suit would dispense with the necessity of many separate cases. Doubtless this would be desirable if the problem at present were general and not local. But to make it general would require further affirmative legislation, as in the case of the equalization by law of teachers' pay without regard to sex. But clearly the court has no power to order or even authoritatively advise legislation. From a realistic point of view it may be that the embarrassment to the Counties by withholding the Equalization Fund would result in political pressure on the Legislature now in session to increase the amount of the Fund sufficiently to enable the Counties, without cost to themselves, to equalize salaries; but this is a political consideration which the court is not at liberty to entertain. I conclude therefore that the County Board of Education of Anne Arundel County is a necessary and indispensable party to the plaintiff's ultimate objective.

 But even if this suit could be maintained in the absence of the County Board of Education, there are other reasons why the injunctive relief prayed for with respect to the Equalization Fund should not be granted. The right to the writ of injunction is not absolute but lies in sound judicial discretion, and it may properly be withheld where it will do the plaintiff relatively little good and the defendant great harm. Di Giovanni v. Camden Fire Ins. Ass'n, 296 U.S. 64, 70, 56 S. Ct. 1, 80 L.Ed. 47; Petroleum Exploration, Inc., v. Public Serv. Comm., 304 U.S. 209, 218, 58 S.Ct. 834, 82 L.Ed. 1294; 32 C.J. 81; Vol. 2, Lawrence Equity Jurisprudence, §§ 1095, 1096; Cumming v. Board of Education, 175 U.S. 528, 544, 20 S.Ct. 197, 44 L.Ed. 262. The issuance of the injunction in this case would be futile for

---

[7] The complaint alleges in paragraph 10 that the defendants are enforcing by administrative ruling the discriminatory salary schedule, but the only instance alleged is with respect to a uniform standard form of teachers contract which expressly states that the salary is to be fixed by the County Board of Education

"not less than the minimum salary provided by law." And it is clear from the statutes themselves that the defendants have no duty or authority to enforce the statutes against the plaintiffs, as the matter is committed to the County Boards.

any direct legal benefit to the plaintiff, and it would be very detrimental to elementary school education in those Counties which participate in the fund.

 The plaintiff contends that he is entitled to an injunction because he has no other available legal remedy. He points to the well known fact that Congress has not empowered the district courts to issue the writ of mandamus generally as an original writ.[8] But the intentional withholding of that power from this court furnishes no proper reason for the exercise of another power not otherwise appropriate. Di Giovanni v. Camden Fire Ins. Ass'n, 296 U.S. 64, 56 S.Ct. 1, 80 L.Ed. 47. Nor is it correct to say that the plaintiff has no other available legal remedy. On the contrary it is very clear that he has a full, adequate and complete legal remedy by a petition for mandamus in the Circuit Court for Anne Arundel County against the County Board of Education. This is the customary Maryland practice and procedure in the type of case we are here dealing with. Thomas v. Field, 143 Md. 128, 122 A. 25; Clark v. Maryland Institute, 87 Md. 643, 41 A. 126; Graham v. Joyce, 151 Md. 298, 134 A. 332; University of Maryland v. Murray, 169 Md. 478, 182 A. 590.[9] In such a suit, if the federal constitutional question is ruled adversely to the plaintiff, he has the right of ultimate appeal to the Supreme Court of the United States.[10]

 The plaintiff contends that he has an interest in the Equalization Fund which gives him the proper status to maintain this suit against those who have the control of the fund under state laws. But it seems obvious that the plaintiff has no direct proprietary interest in the fund. He is interested in it only to the extent that when received by Anne Arundel County it will facilitate payment of salaries of school teachers in that County. Enjoining distribution of the fund would certainly not aid the plaintiff in this respect. No facts are alleged by the plaintiff to show that he will sustain any injury by the distribution of the fund. His sufficient status to sue here as a citizen who is by occupation a teacher relates to the challenged constitutionality of the minimum salary statutes as allegedly applied in actual practice in the Counties. But with respect to the Equalization Fund, as he has no proprietary interest therein, the case presents only a bare naked question of the alleged unconstitutionality of a State statute, and in such a case the plaintiff does not have an interest entitling him to invoke the power of the court. In Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078, in applying this principle it was said:

"The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some

[8] The reason for this withholding from the district courts of general jurisdiction to issue writs of mandamus (except when used as a writ of execution) has been well expressed by Judge Rose in his text book on Federal Jurisdiction and Procedure, 5th Ed. s. 192, p. 197:
"Under our dual system of government, there are many opportunities for collision between State and Federal authorities. It is not to the public interest that private litigants should be in a position to force them. If a citizen of one State conceived that he had the right to the exercise of some purely ministerial function by a public official of another, he might go into the Federal Courts and apply for a writ of mandamus to compel that State official to do his duty. In the long run it is probably better that he be forced to seek relief of this kind from a State tribunal. Doubtless prejudice or partiality sometimes there stands in the way of his getting what he should have. If it does it is a lesser evil than to arouse the antagonisms always so easily stirred up when a Federal Court undertakes to

order a State officer to do anything."

[9] It appears that mandamus suits are now pending in Montgomery and Calvert Counties of the State wherein colored school teachers are seeking to require the respective Counties to equalize the salaries of white and colored teachers. See International Juridical Association Monthly Bulletin, September 1937, p. 32 as to the case of Wm. B. Gibbs, Jr., v. Bromme, et al., in Montgomery County; and Elizabeth Brown v. Board of Education of Calvert County, same publication for February 1938, p. 101. It is stated pending judicial decision in each of these cases the parties are in process of reaching a mutually satisfactory agreement.

[10] Ordinarily the adequate legal remedy which defeats the equitable one must be one that is available in the federal court; but this principle seems not applicable to the situation here where the legal remedy of mandamus has been withheld by Congress from the federal courts on grounds of policy peculiarly applicable to this case. See Di Giovanni v. Camden Fire Ins. Ass'n, 296 U.S. 64, 56 S.

direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."[11]

There is another important consideration to be borne in mind in exercising discretion as to the issuance of the injunction sought. It would cause a serious embarrassment in the administration of the minimum program of education. The Equalization Fund constitutes moneys belonging to the State, and the only defendants in this case are general State officers represented by the Attorney General of the State. In substance, the action itself is against the State and would seem to be within the prohibition of the Eleventh Amendment if the State's immunity has not been waived by the general ground assigned in the motion to dismiss. See Rule 12 (b) (h) of the new federal rules of civil procedure, 28 U.S.C.A. following section 723c. This immunity is a personal privilege which may be waived. Missouri v. Fiske, 290 U.S. 18, 24, 54 S.Ct. 18, 78 L.Ed. 145. But even if it has technically been waived, nevertheless in dealing with the subject matter it must be borne in mind that interference by injunction by federal courts with important state activities should be avoided except where clearly required to give effect to supreme federal law. This was well expressed by Mr. Justice Cardozo in Hawks v. Hamill, 288 U.S. 52, 60, 53 S.Ct. 240, 243, 77 L.Ed. 610:

"Caution and reluctance there must be in any case where there is the threat of opposition, in respect of local controversies, between state and federal courts. Caution and reluctance there must be in special measure where relief, if granted, is an interference by the process of injunction with the activities of state officers discharging in good faith their supposed official duties. In such circumstances this court has said that an injunction ought not to issue 'unless in a case reasonably free from doubt.' Massachusetts State Grange v. Benton, 272 U.S. 525, 527, 47 S.Ct. 189, 71 L.Ed. 387. This rule has been characterized as an 'important' one, to be 'very strictly observed.' 272 U.S. at pages 527, 529, 47 S.Ct. 189, 71 L.Ed. 387. Compare Gilchrist v. Interborough Rapid Transit Co., 279 U.S. 159, 49 S.Ct. 282, 73 L.Ed. 652; Cavanaugh v. Looney, 248 U.S. 453, 456, 39 S.Ct. 142, 63 L.Ed. 354."

In Petroleum Exploration, Inc., v. Public Service Comm., 304 U.S. 209, 222, 58 S.Ct. 834, 841, 82 L.Ed. 1294, it was said by Mr. Justice Reed:

"The extraordinary powers of injunction should be employed to interfere with the action of the state or the depositaries of its delegated powers, only when it clearly appears that the weight of convenience is upon the side of the protestant. Only a case of manifest oppression will justify a federal court in laying such a check upon administrative officers *colore officii* in a conscientious endeavor to fulfill their duty to the state."

The same principle was announced by Mr. Justice Harlan in Cumming v. Board of Education, 175 U.S. 528, 545, 20 S.Ct. 197, 201, 44 L.Ed. 262, (a school case), where he said:

"We may add that while all admit that the benefits and burdens of public taxation must be shared by citizens without discrimination against any class on account of their race, the education of the people in schools maintained by state taxation is a matter belonging to the respective states, and any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of rights secured by the supreme law of the land."

The importance of the subject matter and the novelty of the contention now first made under the equal protection clause of the Fourteenth Amendment has seemed to warrant the full discussion which has been submitted:

To summarize, the conclusions are:

1. The allegations of the complaint that the Maryland minimum salary statutes for teachers in public schools are practically administered in many of the Counties in such a way that there is discrimination against colored teachers solely on account of race and color charges an unlawful denial of the equal protection of the laws to colored school teachers in Counties, if any, where such conditions prevail; but

Ct. 1, 80 L.Ed. 47; Petroleum Exploration, Inc., v. Public Serv. Comm., 304 U.S. 209, 58 S.Ct. 834, 82 L.Ed. 1294.

[11] See, also, Demmert v. Smith, 9 Cir., 82 F.2d 950, where the court refused to enjoin the distribution of an appropriation of the Territory of Alaska alleged to be discriminatory in respect to civil rights under the Fourteenth Amendment.

2. As the responsibility for this alleged wrongful and discriminatory action lies with those Counties, if any, where such conditions prevail, and as there is no denial of equal protection of the laws with respect to the distribution of the State moneys called the Equalization Fund among the Counties, this action cannot properly be maintained against the defendants who are general State officers and not County officials, in the absence from the record of the latter who are indispensable parties to the case. It would be contrary to the elementary principles of due process of law to determine the rights of an absent indispensable party.

3. The plaintiff as a qualified school teacher, rather than as a public employe, has sufficient status to have the question determined in a suit against the proper party.

4. An injunction against these defendants to prohibit the distribution of the Equalization Fund is not a proper remedy in this case because (a) it would be futile as to the plaintiff's ultimate objective; (b) it would be an unnecessary embarrassment in the handling of the State's moneys, and (c) it would deprive the Counties, who are the beneficiaries of the Fund and who are not parties to this case, and especially those who have equalized their teachers' salaries, of school funds without due process of law as to them.

For these reasons the complaint in this action as now presented must be dismissed unless counsel for the plaintiff desire to amend the complaint, in which case a motion for a desired amendment will be considered when submitted. If in ten days no such amendment is requested, counsel may submit the appropriate order for dismissal.