Ola L. BRYAN, Essie M. David, Charles E. Davis, Rosa D. Davis, Vivian V. Floyd, Bee A. Fogan, Hattie M. Fulton, Rutha M. Ingram, Mary E. Jackson, Frazier H. Keitt, Luther Lucas, James B. Mays, Laura Pickett, Howard W. Shefton, Betty Smith, Leila M. Summers and Clarence V. Tobin, Plaintiffs,

v.

M. G. AUSTIN, Jr., as Superintendent of School District No. 7, of Orangeburg County, the State of South Carolina, and W. B. Bookhardt, Harold Felder, T. T. McEachern, Elmo Shuler and Ulmer Weeks, as the Board of Trustees of School District No. 7, of Orangeburg County, the State of South Carolina, Defendants.

Civ. A. 5792.

United States District Court
E. D., South Carolina,
Charleston Division.

Order Filed Jan. 22, 1957.

Jan. 23, 1957.

Lincoln C. Jenkins, Jr., Columbia, S. C., and Thurgood Marshal, Jack Greenburg, New York City, for plaintiffs.

A. J. Hydrick, Jr., and Marshall Williams, Orangeburg, S. C., Robert McC. Figg, Jr., Charleston, S. C., P. H. McEachin, Florence, S. C., D. W. Robinson, Columbia, S. C., T. C. Callison, Atty. Gen. of South Carolina and Daniel R. McLeod and James S. Verner, Asst.

Attys. Gen., of South Carolina, for defendants.

Before PARKER, Chief Judge, and TIMMERMAN and WILLIAMS, District Judges.

WILLIAMS, District Judge.

■ This is an action by Negro school teachers against the School Superintendent and the Board of Trustees of a school district in South Carolina. Its purpose is to obtain a declaratory judgment that the South Carolina statute making unlawful the employment by the state, or by a school district of the state, of any member of the National Association for the Advancement of Colored People is unconstitutional and void and to enjoin the enforcement of the statute in violation of their constitutional rights. As the defendants are engaged in the enforcement of a statute of state wide application and injunction is asked against them, a court of three judges is appropriate for the hearing of the case. City of Cleveland v. United States, 323 U.S. 329, 65 S.Ct. 280, 89 L.Ed. 274. Such a court has accordingly been convened, the parties have been heard, the Attorney General of the State has been heard orally and by brief, and the parties after the hearing have been allowed to file additional briefs, which have been received and considered.

There is no dispute as to the facts. Plaintiffs are seventeen Negro school teachers, who had been employed in Elloree Training School of School District No. 7 of Orangeburg County, South Carolina, prior to June 1956 for varying periods of time, one for as long as ten years. There is evidence to the effect that they were competent teachers and there is no evidence that their service was unsatisfactory in any way. In March 1956 the Legislature of South Carolina passed the act here complained of, 49 St. at Large, p. 1747, one of the provisions of which authorized the board of trustees of any school to demand of any teacher that he submit a statement under oath as to whether or not he was a member of the National Association for Advancement of Colored People, and provided that anyone refusing to submit such statement should be summarily dismissed. Other sections of the act made it unlawful for any member of that association to be employed by any school district and imposed a fine of $100 for employing any individual contrary to the provisions of the Act. When plaintiffs in May of 1956 were given blank applications by the School Superintendent to be filled out and sworn to, which contained questions as to their membership in the Association and their views as to the desirability of segregation in the schools, they declined to answer these questions. Only one of the plaintiffs, however, was a member of the Association. Upon being told that they would have to fill in the answers or tender their resignations, they chose the latter course and were not elected as teachers for the ensuing year. Three questions are presented by the case: (1) Is the statute unconstitutional as plaintiffs contend? (2) Are plaintiffs in position to raise the question as to its unconstitutionality? And (3) Can the court grant plaintiffs any relief in view of the fact that plaintiffs have resigned as teachers and others have been elected to their places?

We think we should use our discretion in refusing to pass on the issues in this controversy at this time. It does not appear that the statute in question has been interpreted by a state court, and it is not proper to pass upon the controversy presented herein until a South Carolina court has first heard the case and passed upon the constitutionality of the Act in question.

In 1941 the United States Supreme Court had before it the case of Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 645, 85 L.Ed. 971. This case involved a regulation by a state commission authorized by statute, and it was contended that the regulation was in violation of

the Equal Protection, the Due Process and the Commerce Clauses of the Constitution. The United States Supreme Court had the following statement to make with reference to the three-judge District Court's decision which enjoined the enforcement of the regulation:

" * * * But no matter how seasoned the judgment of the district court may be, it cannot escape being a forecast rather than a determination. The last word on the meaning of Article 6445 of the Texas Civil Statutes, and therefore the last word on the statutory authority of the Railroad Commission in this case, belongs neither to us nor to the district court but to the supreme court of Texas. In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication. Glenn v. Field Packing Co., 290 U.S. 177, 54 S.Ct. 138, 78 L.Ed. 252; Lee v. Bickell, 292 U.S. 415, 54 S.Ct. 727, 78 L.Ed. 1337. The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court. The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication."

* * * * * *

In the case of American Federation of Labor v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873, the Court held that the bill had equity, but the trial court erred in adjudicating the merits of the controversy, saying:

" * * * The crux of the matter is the allegation that there is an imminent threat to an entire system of collective bargaining, a threat which, if carried through, will have such repercussions on the relationship between capital and labor as to cause irreparable damage. We conclude for that reason that

the bill states a cause of action in equity.

"As we have said, the District Court passed on the merits of the controversy. In doing so at this stage of the litigation, we think it did not follow the proper course. The merits involve substantial constitutional issues concerning the meaning of a new provision of the Florida constitution which, so far as we are advised, has never been construed by the Florida courts. Those courts have the final say as to its meaning. When authoritatively construed, it may or may not have the meaning or force which appellees now assume that it has. In absence of an authoritative interpretation, it is impossible to know with certainty what constitutional issues will finally emerge. What would now be written on the constitutional questions might therefore turn out to be an academic and needless dissertation." 327 U.S. at pages 595–596, 66 S.Ct. at page 767.

* * * * * *

Plaintiffs in this case claim that the act in question is so clear that it should be construed by us and that we should decide all of the issues. In the case of Albertson v. Millard, 345 U.S. 242, 73 S.Ct. 600, 602, 97 L.Ed. 983, the issues were equally clear and free from ambiguity. The appellants challenged the definitions in the act as being void for vagueness. Mr. Justice Douglas in a dissenting opinion said:

" * * * There are no ambiguities involving these appellants. The constitutional questions do not turn on any niceties in the interpretation of the Michigan law. The case is therefore unlike Rescue Army v. Municipal Court, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666, and its forebears where the nature of the constitutional issue would depend on the manner in which uncertain and ambiguous state statutes were construed. See

especially A. F. of L. v. Watson, 327 U.S. 582, 598, 66 S.Ct. 761, 768, 90 L.Ed. 873. Here there are but two questions:

"(1) Can Michigan require the Communist Party of Michigan and its Executive Secretary to register?

"(2) Can Michigan forbid the name of any Communist or of any nominee of the Communist Party to be printed on the ballot in any primary or general election in the state?"

However, the opinion of the Court in this case states:

"We deem it appropriate in this case that the state courts construe this statute before the District Court further considers the action. See Rescue Army v. Municipal Court, 1947, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666; American Federation of Labor v. Watson, 1946, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873; and Spector Motor Service v. McLaughlin, 1944, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101.

"The judgment is vacated and the cause remanded to the District Court for the Eastern District of Michigan with directions to vacate the restraining order it issued and to hold the proceedings in abeyance a reasonable time pending construction of the statute by the state courts either in pending litigation or other litigation which may be instituted."

The case of Government and Civic Employees Organizing Committee, CIO v. Windsor, D.C., 116 F.Supp. 354, affirmed in a *per curiam* decision without opinion, 347 U.S. 901, 74 S.Ct. 429, 98 L.Ed. 1061, is even stronger than the Albertson case supra. This case involved a statute prohibiting state public employees from belonging to labor unions or organizations and provided for forfeiture of certain rights of those who joined a labor union or organization. The statute was clear and free from ambiguity. Plaintiffs there took the same position as the plaintiffs in the case at bar as indicated in the district court's opinion, 116 F.Supp. at page 357:

"Plaintiffs contend that the challenged statute is self-executing and that it lends itself to no possible construction other than that of unconstitutionality under the Due Process Clause of the Fourteenth Amendment. They insist that they do not have to wait longer before seeking relief in a federal court, because they think that 'Alabama's Legislature has used unmistakably simple, clear, and mandatory language' and that 'there is neither need for interpretation of the statute nor any other special circumstance requiring the federal court to stay action pending proceedings in the State courts.' Toomer v. Witsell, 334 U.S. 385, 392, 68 S. Ct. 1156, 1160, 92 L.Ed. 1460. The defendants assert among other grounds that plaintiffs have not exhausted available state administrative and judicial remedies and that consequently this court, as a matter of sound, equitable discretion, should decline to exercise jurisdiction.

\* \* \* \* \* \*

"The exercise of jurisdiction under the Federal Declaratory Judgment Act [28 U.S.C.A. § 2201] is discretionary and not compulsory. Smith v. Massachusetts Mutual Life Ins. Co., 5 Cir., 167 F.2d 990; Brillhart v. Excess Ins. Co., 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620. The remedy by injunction is likewise discretionary. Peay v. Cox, 5 Cir., 190 F.2d 123."

The district court withheld exercise of jurisdiction and retained the case to permit the exhaustion of state administrative and judicial remedies as might be available.

■ In every case in which the question was raised since the Pullman case in 1941, the United States Supreme Court has held that a district court

should not pass on the merits of a controversy in a case such as the one before us until the highest court of the state has interpreted the state constitutional provision, statute, or regulation in question. City of Chicago v. Fieldcrest Dairies, 316 U.S. 168, 62 S. Ct. 986, 86 L.Ed. 1355; Spector Motor Service v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101; A. F. of L. v. Watson, supra; Shipman v. Du Pre, 339 U.S. 321, 70 S.Ct. 640, 94 L.Ed. 877; Albertson v. Millard, supra; Government and Civic Employees Organizing Committee, CIO v. Windsor, supra.

In the instant case, there is no question that the Supreme Court of South Carolina is in a better position than the federal court to interpret the state statute. The fact that there might be delay, inconvenience and cost to the parties does not call for a different conclusion. We are here concerned with a much larger issue as to the appropriate relationship between state and federal authorities functioning as an harmonious whole.

It may be true that the statute in question is clear and unequivocal but this does not prevent us from exercising our discretion in requiring that it be submitted to the state court for interpretation. Government and Civic Employees Organizing Committee, CIO v. Windsor, supra. It appears to us that the Michigan and Alabama Acts were clear and free from ambiguity. The Supreme Court, however, held that the district court should refrain from taking any action until the highest state court had passed upon the constitutionality of the Act. The state and federal courts of South Carolina have always worked in perfect harmony. To declare an act of the state legislature unconstitutional should be left to the state court. This, of course, would not apply to statutes and constitutional provisions which have already been declared unconstitutional by the United States Supreme Court in the school segregation cases. We hold that the federal court should stay proceedings and permit the state court to pass upon the constitutionality of the Act in question. It is only by doing this that we avoid conflict between state and federal courts and preserve harmonious relationships which have heretofore existed between them.

The case should not be dismissed but should be retained and remain pending to permit the plaintiffs a reasonable time for the exhaustion of state administrative and judicial remedies as may be available; but thereafter such further proceedings, if any, will be had by this court as may then appear to be lawful and proper.

It is so ordered.

PARKER, Chief Judge (concurring in part and dissenting in part).

I concur in so much of the decision of the Court as holds that the Court has jurisdiction of the cause and that same should not be dismissed. I dissent from that part of the decision which stays proceedings pending exhaustion of state administrative and judicial remedies. I think that the Court should proceed to grant declaratory and injunctive relief to the plaintiffs in application of the principle stated by Chief Justice Marshall in Cohens v. Commonwealth of Virginia, 6 Wheat. 264, 404, 5 L.Ed. 257 that "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given". One of the most important features of that ordered liberty which is guaranteed by our Constitution is that certain fundamental rights of the individual, including freedom of speech and freedom of assembly, shall not be denied or abridged by the exercise of governmental power, national or state. And no more important duty is imposed upon the courts of the United States than to protect these fundamental rights of the individual citizen against impairment by the exercise of governmental power.

I recognize, of course, that, in the application of the rule of comity, a federal court should stay action pending

action by the courts of a state, where it is called upon to enjoin the enforcement of a state statute which has not been interpreted by the state courts, and where the statute is susceptible of an interpretation which would avoid constitutional invalidity. As the federal courts are bound by the interpretation placed by the highest court of a state upon a statute of that state, they should not enjoin the enforcement of a statute as violative of the Constitution in advance of such an interpretation, if it is reasonably possible for the statute to be given an interpretation which will render it constitutional. This is all that is held by the Supreme Court in such cases as Shipman v. Du Pre, 339 U.S. 321, 70 S.Ct. 640, 94 L.Ed. 877 and A. F. of L. v. Watson, 327 U.S. 582, 596, 598, 66 S.Ct. 761, 90 L.Ed. 873. The Supreme Court in Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 344, 71 S.Ct. 762, 95 L.Ed. 1002, recognizes that proceedings should be stayed only where there is involved "construction of a state statute so ill-defined that a federal court should hold the case pending a definitive construction of that statute in the state courts". In the case of Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L. Ed. 1460, in which the District Court had upheld the constitutionality of a state statute, the Supreme Court reversed the decision without staying proceedings for action by the state courts. And in Doud v. Hodge, 350 U.S. 485, 76 S.Ct. 491, 100 L.Ed. 577, the Supreme Court reversed the dismissal of a case by a District Court, 127 F.Supp. 853, where the dismissal was granted on the ground that a statute alleged to be unconstitutional had not been passed upon by the courts of the state. The rule as to stay of proceedings pending interpretation of a state statute by the courts of the state can have no application to a case, such as we have here, where the meaning of the statute is perfectly clear and where no interpretation which could possibly be placed

upon it by the Supreme Court of the state could render it constitutional.

The statute, the constitutionality of which is here questioned, is as follows:

"Section 1. Thirty days after the effective date of this act it shall be unlawful for any member of the National Association for the Advancement of Colored People to be employed by the State, school district, county or any municipality thereof, and such prohibition against employment by the State, school district, county or any municipality thereof shall continue so long as membership in the National Association for the Advancement of Colored People is maintained.

"Section 2. The board of trustees of any public school or State supported college shall be authorized to demand of any teacher or other employee of the school, who is suspected of being a member of the National Association for the Advancement of Colored People, that he submit to the board a written statement under oath setting forth whether or not he is a member of the National Association for the Advancement of Colored People, and the immediate employer of any employee of the State or of any county or municipality thereof is similarly authorized in the case any employee is suspected of being a member of the National Association for the Advancement of Colored People. Any person refusing to submit a statement as provided herein, shall be summarily dismissed.

"Section 3. A person dismissed from, or declared ineligible for, employment under the provisions of this act, may within four months of such dismissal or declaration of ineligibility be entitled to petition for an order to show cause before any circuit court of the State why a hearing on such charges should not be had. Until

the final judgment on said hearing is entered, the order to show cause shall stay the effect of dismissal or ineligibility based on the provisions of this act. The hearing shall consist of the taking of testimony in open court with opportunity for cross examination. The burden of sustaining the validity of an order of dismissal or declaration of ineligibility by a fair preponderance of the credible evidence shall be upon the person making such dismissal or declaration of ineligibility.

"Section 4. Any person employing any individual contrary to the provisions of this act shall be subject to a fine of not exceeding one hundred dollars for each separate offense."

There is no finding in the preamble to the statute,* nor is there any contention, that it is the purpose of the National Association for the Advancement of Colored People to overthrow the government by force and violence or to engage in any other form of criminal conduct. The organization, as its name implies, is engaged in activities for advancing the interests of Colored People; and this has involved its en-gaging in matters of public controversy such as the segregation cases, the results of which have been very unpopular in some sections. This, however, is no reason why it may be proscribed by law or its members denied the right of public employment. The right to join organizations which seek by lawful means to support and further what their members regard as in the public interest or in the interest of a particular part of the public, is protected by the constitutional guarantees of free speech and freedom of assembly; and such right is one of the bulwarks of liberty and of social progress. The fact that organizations may render themselves unpopular with the majority in a community is no reason why the majority may use its power to enact legislation denying to their members the fundamental rights of constitutional liberty. As was well said by Chief Justice Hughes in De Jonge v. State of Oregon, 299 U.S. 353, 364–365, 57 S. Ct. 255, at page 260, 81 L.Ed. 278:

"Freedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment of the Federal Constitution. [Citing cases.] The right

---

* The preamble to the statute is as follows:
"Whereas, the National Association for the Advancement of Colored People has, through its program and leaders in the State of South Carolina, disturbed the peace and tranquility which has long existed between the White and Negro races, and has threatened the progress and increased understanding between Negroes and Whites; and

"Whereas, the National Association for the Advancement of Colored People has encouraged and agitated the members of the Negro race in the belief that their children were not receiving educational opportunities equal to those accorded white children, and has urged the members of the Negro race to exert every effort to break down all racial barriers existing between the two races in schools, public transportation facilities and society in general; and

"Whereas, the National Association for the Advancement of Colored People has made a strenuous effort to imbue the members of the Negro race with the belief that they are the subject of economic and social strangulation which will forever bar Negroes from improving their station in life and raising their standard of living to that enjoyed by the White race; and

"Whereas, the General Assembly believes that in view of the known teachings of the National Association for the Advancement of Colored People and the constant pressure exerted on its members contrary to the principles upon which the economic and social life of our State rests, and that the National Association for the Advancement of Colored People is so insidious in its propaganda and the fostering of those ideas designed to produce a constant state of turmoil between the races, that membership in such an organization is wholly incompatible with the peace, tranquility and progress that all citizens have a right to enjoy. Now, therefore,".

of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental. As this Court said in United States v. Cruikshank, 92 U.S. 542, 552, 23 L.Ed. 588: 'The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances.' The First Amendment of the Federal Constitution expressly guarantees that right against abridgment by Congress. But explicit mention there does not argue exclusion elsewhere. For the right is one that cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions—principles which the Fourteenth Amendment embodies in the general terms of its due process clause. [Citing cases.]

"These rights may be abused by using speech or press or assembly in order to incite to violence and crime. The people through their Legislatures may protect themselves against that abuse. But the legislative intervention can find constitutional justification only by dealing with the abuse. The rights themselves must not be curtailed. The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government."

See also Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070; West Virginia State Board of Education v. Barnette, 319 U.S. 624, 641–642, 63 S.Ct. 1178, 87 L.Ed. 1628; Thomas v. Collins, 323 U.S. 516, 530–531, 65 S.Ct. 315, 89 L.Ed. 430.

In Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 219, 97 L.Ed. 216, the Supreme Court held violative of the due process clause of the Fourteenth Amendment a state law requiring of state employees as a condition of employment an oath that they were not members of an organization listed by the Attorney General of the United States as subversive. The state supreme court had held that mere membership in such an organization was a disqualification, without knowledge of its criminal purposes. In holding the act violative of the due process clause of the Fourteenth Amendment, the court said:

"Under the Oklahoma Act [51 O. S.1951 §§ 37.1–37.8], the fact of association alone determines disloyalty and disqualification; it matters not whether association existed innocently or knowingly. To thus inhibit individual freedom of movement is to stifle the flow of democratic expression and controversy at one of its chief sources. We hold that the distinction observed between the case at bar and Garner, Adler and Gerende [Gerende v. Board of Supervisors of Elections, 341 U.S. 56, 71 S.Ct. 565, 95 L.Ed. 745] is decisive. Indiscriminate classification of innocent with knowing activity must fall as an assertion of arbitrary power. The oath offends due process."

In that case the Supreme Court adverted to its statement in United Public Workers of America (C.I.O.) v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754, upholding the Hatch Act, 18 U.S. C.A. § 595 et seq., that Congress could not "enact a regulation providing that no Republican, Jew Or Negro shall be appointed to federal office, or that no

federal employee shall attend Mass or take any active part in missionary work."

And in his concurring opinion Mr. Justice Frankfurter used the following language, which is peculiarly pertinent here, viz.:

"The Constitution of the United States does not render the United States or the States impotent to guard their governments against destruction by enemies from within. It does not preclude measures of self-protection against anticipated overt acts of violence. Solid threats to our kind of government —manifestations of purposes that reject argument and the free ballot · as the means for bringing about changes and promoting progress— may be met by preventive measures before such threats reach fruition. However, in considering the constitutionality of legislation like the statute before us it is necessary to keep steadfastly in mind what it is that is to be secured. Only thus will it be evident why the Court has found that the Oklahoma law violates those fundamental principles of liberty 'which lie at the base of all our civil and political institutions' and as such are imbedded in the due process of law which no State may offend."

In the very recent case of Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692, the Supreme Court held squarely that public employment might not be denied on the ground that a person had exercised a right under the Constitution. In that case a professor in a publicly maintained college was discharged because he had invoked his right under the Fifth Amendment not to answer a question propounded in a Congressional inquiry. The Supreme Court followed its decision in the case of Wieman v. Updegraff and distinguished the cases of Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 and Garner v. Board of Public Works of City of Los Angeles, 341 U.S. 716, 720, 71 S.

Ct. 909, 95 L.Ed. 1317, upon which defendants rely. The court said [350 U.S. 551, 76 S.Ct. 639]:

"The problem of balancing the State's interest in the loyalty of those in its service with the traditional safeguards of individual rights is a continuing one. To state that a person does not have a constitutional right to government employment is only to say that he must comply with reasonable, lawful, and nondiscriminatory terms laid down by the proper authorities. Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517, upheld the New York Feinberg Law which authorized the public school authorities to dismiss employees who, after notice and hearing, were found to advocate the overthrow of the Government by unlawful means, or who were unable to explain satisfactorily membership in certain organizations found to have that aim. Likewise Garner v. Board of Public Works of City of Los Angeles, 341 U.S. 716, 720, 71 S.Ct. 909, 912, 95 L.Ed. 1317, upheld the right of the city to inquire of its employees as to 'matters that may prove relevant to their fitness and suitability for the public service', including their membership, past and present, in the Communist Party or the Communist Political Association. There it was held that the city had power to discharge employees who refused to file an affidavit disclosing such information to the school authorities.

"But in each of these cases it was emphasized that the State must conform to the requirements of due process. In Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216, we struck down a so-called 'loyalty oath' because it based employability solely on the fact of membership in certain organizations. We pointed out that membership itself may be inno-

cent and held that the classification of innocent and guilty together was arbitrary. This case rests squarely on the proposition that 'constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory.' 344 U.S. at page 192, 73 S.Ct. at page 219."

The principle here involved is that the state may not deny a privilege because of exercise of constitutional rights. Terral v. Burke Construction Co., 257 U.S. 529, 42 S.Ct. 188, 66 L. Ed. 352; Frost (Frost Trucking Co.) v. Railroad Commission, 271 U.S. 583, 594, 46 S.Ct. 605, 70 L.Ed. 1101; Alston v. School Board of City of Norfolk, 4 Cir., 112 F.2d 992, 997, 130 A.L.R. 1506. The Court of Appeals of this Circuit, in the case last cited, quoting from the opinion in Frost (Frost Trucking Co.) v. Railroad Commission, supra, said:

"Even in the granting of a privilege, the state 'may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.' "

The plaintiffs are in a position to raise the question of the constitutionality of the statute because one of them is a member of the Association and all have been denied employment because of their refusal to answer the questions as to membership in that organization. The school authorities, may, of course, make inquiries of prospective teachers as to matters bearing upon their character and fitness to teach; but this is a very different thing from making inquiry as to membership in an organization which they have a right to join but membership in which, under state law, bars them of the right of employment.

Just as they have a right not to be denied employment because of such membership, they have a right not to be denied employment for refusal to make oath with regard to the matter. What was required of them was not merely answers to questions but the filing of a sworn statement. This was requiring of them a "test oath" relating to membership as a condition of employment which was clearly an invasion of their constitutional rights as held in Wieman v. Updegraff, supra.

It is argued that plaintiffs are no longer employed by defendants and that they have no applications for positions pending which could be adversely affected by the statute. This is to take too narrow a view of the rights of plaintiffs, who are public school teachers by profession whose rights are invaded by the statute and the inquiries to which they have been subjected thereunder. They are seeking here a declaration as to their rights in a suit instituted against representatives of the state charged with the enforcement of the statute in the locality in which they reside, in which the provisions of the statute have been enforced against them, in which they desire to teach and in which they would naturally seek employment as teachers in the future.

In the case of Alston v. School Board of City of Norfolk, supra, 4 Cir., 112 F.2d 992, 130 A.L.R. 1506, the Court of Appeals of the Fourth Circuit had before it a case in which injunction was sought against fixing the salaries of Negro teachers at a lower rate than that of white teachers. It was argued that plaintiffs had no right to maintain the suit because employment was optional with the school board and they had entered into contracts for the current year at the rate fixed by the discriminatory practice. The court rejected this contention in language which is appropriate here, saying:

"We come, then, to the second question, i. e., do plaintiffs as Negro teachers holding certificates qualifying them to teach in the

public schools of Norfolk have rights which are infringed by the discrimination of which they complain? The answer to this must be in the affirmative. As teachers holding certificates from the state, plaintiffs have acquired a professional status. It is true that they are not entitled by reason of that fact alone to contracts to teach in the public schools of the state; for whether any particular one of them shall be employed to teach is a matter resting in the sound discretion of the school authorities; but they are entitled to have the compensation for positions for which they may apply, and which will unquestionably be awarded to some of them, fixed without unconstitutional discrimination on account of race. As pointed out by Judge Chesnut, in Mills v. Lowndes, supra [D.C., 26 F.Supp. 792], they are qualified school teachers and have the civil right, as such, to pursue their profession without being subjected to discriminatory legislation on account of race or color. It is no answer to this to say that the hiring of any teacher is a matter resting in the discretion of the school authorities. Plaintiffs, as teachers qualified and subject to employment by the state, are entitled to apply for the positions and to have the discretion of the authorities exercised lawfully and without unconstitutional discrimination as to the rate of pay to be awarded them, if their applications are accepted.

"Nor do we think that the fact that plaintiffs have entered into contracts with the school board for the current year at the rate fixed by the discriminatory practice precludes them from asking relief. What the effect of such contracts may be on right to compensation for the current year, we need not decide, since plaintiffs are not insisting upon additional compensation for the current year and their prayer for relief asks a broad declaration of rights and injunctive relief for the future. As qualified teachers holding certificates, they have rights as above indicated which are not confined to the contract for the current year, i. e., the right to apply for positions in the future and to have the Board award the positions without unconstitutional discrimination as to the rate of pay."

It is argued also that plaintiffs are not entitled to invoke the process of this court because they have not exhausted administrative remedies and that at all events they should proceed in the state courts as the legislation in question has not been before that court for interpretation. As to the latter contention, it is perfectly clear, as heretofore pointed out, that there is no ambiguity in the statute and that no interpretation which could be placed upon it by the Supreme Court of the state would render it constitutional and that consequently there is no reason to stay proceedings in the federal court while the state courts are giving it consideration. Likewise, as to exhaustion of administrative remedies, there is no reason to stay proceedings in the federal court for exhaustion of remedies under the statute, when no remedy could possibly cure the basic defect of unconstitutionality. Furthermore, the remedy provided by the statute is not administrative but judicial; and it is well settled that judicial remedies in state courts need not be exhausted before resorting to a federal court. Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; Carson v. Warlick, 4 Cir., 238 F.2d 724. The contention that there is an adequate remedy at law is manifestly without merit since plaintiffs obviously cannot recover damages for breach of a contract that has not been made and any recovery of damages under the civil rights statute would be speculative and problematical. Only by declaratory and injunctive relief can

they obtain any adequate protection of their rights which have been invaded by the statute and the action taken thereunder.

As to the relief which the Court should grant, plaintiffs are not asking an award of damages and any question with regard thereto is not before us. The action is not one in which the court could direct that the plaintiffs be restored to the positions formerly held by them in view of the fact that their term of employment ended with the school year in June 1956 and they did not seek reemployment for the succeeding year. The court can and should, however, protect the rights of plaintiffs for the future by declaring the statute unconstitutional and enjoining the defendants from enforcing it against plaintiffs either by denying them employment because of membership in the National Association for the Advancement of Colored People or requiring them as a condition of employment to make affidavit or answer questions with regard to such membership. In my opinion, decree to that effect should be entered without awaiting action in the state courts, as the statute is unambiguous and clearly unconstitutional.

TIMMERMAN, District Judge (concurring in part and dissenting in part).

It is to be regretted that the members of this three-judge Court are not in agreement. In a general way, the order to be filed herein at the time that the separate opinions of the members of this Court are filed will correctly state the differences existing among the members of the Court. As will be seen by what shall follow, I am in disagreement with my colleagues on the main issues in this case.

This action was originally brought by eighteen negro plaintiffs, former school teachers, against the defendants, the Superintendent and Board of Trustees of School District No. 7, Orangeburg County, South Carolina, in which Elloree Training School is situate. As stated in plaintiffs' brief, the purpose of the action is to enjoin the defendants from "(1) refusing to continue plaintiffs' employment as school teachers *solely because of their membership in the National Association for the Advancement of Colored People;* (2) requiring plaintiffs to supply *information concerning their beliefs and associations* particularly with respect to membership in said association as a condition of continued employment; (3) refusing to continue plaintiffs' employment because they have refused to disclose whether or not they are members of said association." (Emphasis added). Plaintiffs' case is based on the allegation that defendants acted in derogation of their rights under an unconstitutional State statute; and, upon that allegation, a court of three judges was convened pursuant to 28 U.S.C.A. §§ 2281 and 2284. When the cause came on for hearing, the Court was informed that the plaintiff Carmichael had withdrawn from the case.

Plaintiffs allege that defendants deprived them of constitutional rights in the enforcement of the State statute. See Act No. 741, Acts and Joint Resolutions of the General Assembly of South Carolina, 1956, 49 St. at Large, p. 1747. Plaintiffs claim that this statute is unconstitutional, in that defendants (a) required them to file written applications for employment, and (b) refused to reemploy them as school teachers when they failed to complete and file applications for employment on required forms. By their answer, defendants admit that plaintiffs were not re-employed because they failed to file completed application forms. They deny that plaintiffs had a legal right to be employed as teachers; that there was anything wrongful in their failure to re-employ plaintiffs; or that they in any way acted in the enforcement of the cited State statute.

I agree that "[t]here is no dispute as to the facts." And such being the case, it is essential that *all* of the established and uncontradicted facts be considered, and that those "facts" which are the product of guess or surmise be eliminated.

Prior to the school year 1956–1957, all of the plaintiffs had been employed as school teachers in the Elloree Training School. They had no tenure. All teacher contracts were entered into between the teachers and the school officials for terms of nine or ten months (a single school year), terminating at the close of each term. The practice in the School District, one adopted many years prior to the enactment of the challenged State statute, was for applicants for employment or re-employment as teachers to submit written applications to the Superintendent of Schools in the District. Prior to May, 1955, an application was not required to be in any prescribed form and was usually a letter addressed to the Superintendent. In May, 1955, however, defendants instituted the practice of providing applicants with printed forms for use in making applications. These forms contained a variety of questions to be answered by applicants pertaining to the applicant's personal as well as professional qualifications. For the school term 1955–1956, all applicants, including plaintiffs, completed such forms and submitted them to the Superintendent. From the applications submitted, defendants selected plaintiffs and others for employment for the school term 1955–1956. For the 1956–1957 school term defendants continued providing a form application for employment as teacher to any person requesting one. In essential detail the form used in 1956–1957 was identical with the form used in 1955–1956. Some of the plaintiffs submitted incomplete applications which the Superintendent returned to them for completion and filing. The plaintiffs never thereafter filed applications for employment, whether completed or not and, consequently, plaintiffs were not considered by the defendant-trustees as applicants. Some of the plaintiffs submitted so-called "resignations". Others were not heard from again. Thereafter, all teaching positions at the Elloree Training School for the current school term were filled from among other negroes who did apply for such employment. It is now proposed, as one may reasonably surmise from all that has been said, that plaintiffs wish the Court to turn the clock back to May, 1956, and enjoin the defendants from refusing to consider plaintiffs as applicants for teacher jobs.

As no plaintiff occupied the status of employee of the School District for the 1956–1957 school term, having entered into no contract for that term, the mentioned "resignations" were idle gestures. If they served any purpose at all, it was to inform defendants that the so-called resigners were not seeking re-employment.

The evidence or, strictly speaking, the lack of it, leaves in doubt which of the questions on the application form plaintiffs were unwilling to answer. A form application, which defendants admit is genuine, is attached to the complaint, but the applications submitted by plaintiffs and which were returned to them for completion were not offered in evidence, although the plaintiffs presumably had possession of them. The only testimony having any possible bearing on the questions that plaintiffs were unwilling to answer was supplied by the plaintiff Davis, who, presuming to speak for the others, stated that plaintiffs objected to answering all questions on the form other than those asking for "professional information". Viewing the agreed form attached to the complaint in the light of this statement, it would appear that plaintiffs at least left the following questions unanswered:

"Religious preference ——— Are you a member? —— If so, state church of which you are a member ——————— List any clubs, organizations, or fraternities to which you belong ————————— Do you belong to the NAACP? —— Does any member of your immediate family belong to the NAACP? —— Do you support the NAACP in any way (money or attendance at meetings)? ————————— Do you favor integration of races in schools? · —— Are you satisfied

with your work and the schools as they are now maintained? Yes —— No ——. If yes, comment on back. Do you feel that you would be happy in an integrated school system, knowing that the parents and students do not favor this system? Yes —— No —— (Check one and give reason for your answer) ——

Do you feel that an integrated school system would better fit the colored race for their life's work? Yes —— No —— (check one and give reason for your answer) ——

Do you think that you are qualified to teach an integrated class in a satisfactory manner? Yes —— No —— (check one and give reason for your answer) ——

Do you feel that the parents of your school know that no public schools will be operated if they are integrated? Yes —— No ——

Do you believe in the aims of the NAACP? ——————

If you should join the NAACP while employed in this school, please notify the superintendent and chairman of the board of trustees. Yes —— No ——

Do you desire a position in the Elloree Training School for the 1956–1957 session?"

Plaintiffs contend that defendants' refusal to accept their incomplete applications for employment denied them rights, privileges, immunities, due process of law and the equal protection of the laws secured by the Fourteenth Amendment of the Constitution, and that the challenged statute, as to them, constitute a bill of attainder proscribed by Article I, Section 10, Clause 1 of the Constitution.

The record in this case does not bear out the assumption that defendants acted under the challenged statute. Hence the issue of the statute's constitutionality is not properly before the Court. Section 1 of the statute makes unlawful the *employment of a member of the National Association for the Advancement of Colored People* by a school district, and further provides that the prohibition against such employment shall continue so long as membership in such organization is maintained. There is an utter failure of evidence that plaintiffs were refused employment because of membership in any organization. Indeed, so far as the record discloses, only the plaintiff Fulton is in fact a member of the NAACP, and she testified that she never told any of the defendants that she was a member; and there is no evidence that any of the defendants otherwise knew that she was a member. Hence, it is ridiculous to say that defendants were enforcing Section 1 of the statute in refusing to employ plaintiffs as teachers. The best that can be said of this frivolous contention is that one might, if he was so disposed, surmise that defendants would have denied plaintiffs employment if the essential facts upon which to rest such action had existed elsewhere than in the imaginations of the plaintiffs.

Section 2 of the statute reads as follows:

"Section 2. *The board of trustees* of any public school or State supported college *shall be authorized to demand of any* teacher or other employee of the school, who is suspected of being a member of the National Association for the Advancement of Colored People, that he submit to the board a written statement under oath setting forth whether or not he is a member of the National Association for the Advancement of Colored People, and the immediate employer of any employee of the State or of any county or municipality thereof is similarly authorized in the case any employee is suspected of being a member of the National Association for the Advancement of Colored People. Any person refusing to submit a statement as provided herein, *shall be summarily dismissed.*" (Emphasis added)

It is apparent that section 2 applies only to *employees*, not to one who wants to be an employee, and the penalty au-

thorized by the section is *dismissal*. The section, therefore, could have had no application to plaintiffs. No plaintiff was an "employee" of the Elloree Training School for the 1956–1957 school term with which we are here concerned; and no plaintiff was "dismissed". They simply declined to become applicants for employment, and, in consequence of their failure to do so they were not employed. It is a distortion to classify plaintiffs as "employees". They were not employees at any time here relevant; and the *ipse dixit* of this Court cannot make them such. The practice of defendants in providing form applications for the use of those desiring employment as teachers for the 1956–1957 school term was nothing more than a continuation of the previous year's practice, which was not objected to by plaintiffs then. To say now that defendants adopted the application form as a means to the enforcement of the challenged statute would be to deal carelessly with the truth. It is an unchallenged fact that the adoption of the application form antedated the statute by ten months. Thus there is a total failure of evidence to support the jurisdiction of this Court.

Section 2281, Title 28 U.S.C.A., is as follows:

"An interlocutory or permanent injunction restraining the *enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute* or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title." (Emphasis added)

As pointed out, plaintiffs were not in such a position that the defendants could have enforced the statute against them

had they wanted to do so. The cited jurisdictional section does not give, nor was it intended to give, this Court jurisdiction to pass upon the constitutionality of a State statute simply because some person here, or elsewhere, might be dissatisfied with its terms. Before a person can properly invoke the jurisdiction of a three-judge Court to hear an attack on the constitutionality of State statute, such person must not only allege, he must prove that the statute has been wrongfully enforced against him to his detriment, or that there is an impending threat to enforce it against him to his detriment. Otherwise, he has no right to vindicate and no interest to protect. Moreover, to claim the protection of a court of equity, a person must allege and prove that no legal remedy is available to him and that he will suffer irreparable injury if a court of equity does not grant relief.

As has been pointed out, on the authority of Cohens v. Commonwealth of Virginia, 6 Wheat. 264, 404, 5 L.Ed. 257, "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." We are here concerned with the last of the two propositions; and I must decline to become a party to usurping power which this Court legally does not have. I also must refuse to classify the issues of the instant case as falling within the comprehension of the constitutional guarantees of the freedoms of speech and assembly, as claimed by plaintiffs. No plaintiff has testified in this case that the defendants have denied him or any of the others the right of free speech, or the right of free assembly; nor has any other witness done so. This Court, therefore, is without evidence of a denial of the rights of free speech and of free assembly; and clearly it has no right by tortuous deductions or unfounded assumptions to supply a seeming basis for such an issue.

The real issue in this case is whether or not public school authorities, acting on their own initiative, are constitution-

ally forbidden to inquire of applicants for teaching positions concerning their associations and beliefs. This case in many respects is similar to Garner v. Board of Public Works of City of Los Angeles, 341 U.S. 716, 720, 71 S.Ct. 909, 912, 95 L.Ed. 1317, where one of the issues before the Court was stated. as follows:

"1. The affidavit raises the issue whether the City of Los Angeles is constitutionally forbidden to require that its employees disclose their past or present membership in the Communist Party or the Communist Political Association. Not before us is the question whether the city may determine that an employee's disclosure of such political affiliation justifies his discharge."

Because of the admitted factual background of the instant case, there could not have arisen the issue of what the Court would do if defendants had in fact discharged plaintiffs because of membership in the NAACP. To the knowledge of defendants no plaintiff was a member and, therefore, no one of them could have been discharged for that reason.

The answer to the stated issue was given by the Court as follows:

"We think that a municipal employer is not disabled because it is an agency of the State from inquiring of its employees as to matters that may prove relevant to their fitness and suitability for the public service. Past conduct may well relate to present fitness; past loyalty may have a reasonable relationship to present and future trust. Both are · commonly inquired into in determining fitness for both high and low positions in private industry and are not less relevant in public employment. The affidavit requirement is valid." 341 U.S. at page 720, 71 S.Ct. at page 912.

This position was reaffirmed in Adler v. Board of Education of City of New York, 342 U.S. 485, 493, 72 S.Ct. 380, 385, 96 L.Ed. 517, a case even more closely in point than the Garner case. There the Court said:

"We adhere to that case [Garner v. Board of Public Works of City of Los Angeles, supra]. A teacher works in a sensitive area in a school room. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted. One's associates, past and present, as well as one's conduct, may properly be considered in determining fitness and loyalty. From time immemorial, one's reputation has been determined in part by the company he keeps. In the employment of officials and teachers of the school system, the state may very properly inquire into the company they keep, and we know of no rule, constitutional or otherwise, that prevents the state, when determining the fitness and loyalty of such persons, from considering the organizations and persons with whom they associate."

The Garner and Adler cases cannot be distinguished in principle from the instant case. Indeed, the present case is much stronger for the defendants than are the two cited cases, where *employees were dismissed* because of their failure to answer inquiries. Here, not only were plaintiffs not employed by defendants, they even refused to file applications for employment, because, as they say, it was none of the school trustees' business who their associates were; what their religious beliefs and affiliations were; to what organizations or societies they belonged; what their views on integration were and how they thought it would affect negro children

to be taught in an integrated school; what they thought of their own fitness to teach in an integrated school, etc. These and other considerations, which normal parents and competent school officials regard as of prime importance to school children, are taboo to plaintiffs. They and their abettors are now asking this Court to write that taboo into the federal Constitution. I know of no law that requires the defendants to select teachers with closed eyes and stuffed ears, ignorant of all but the most technical educational attainments of applicants. Hence I fail to see that plaintiffs have been deprived of any right, constitutional or other, by the defendants.

The inapplicability of the State statute makes it unnecessary to pass upon its constitutionality, but since that issue is discussed in another opinion, I deem it proper to state my views on it. I do not agree that the statute is unconstitutional. It is argued that the legislative findings of fact contained in the preamble of the challenged statute should be peremptorily dismissed as containing no specific finding that the purpose of the NAACP is "to overthrow the government by force and violence or to engage in any other form of criminal conduct." The plain meaning of that contention is that school trustees have no discretion in the selection of teachers except the discretion to refuse to select as teachers those who seek the overthrow of the government by force and violence, or who fall within the category of criminals.

Since one of the legislative findings is that "The National Association for the Advancement of Colored People has, through its program and leaders in the State of South Carolina, disturbed the peace and tranquility which has long existed between the White and Negro races, and has threatened the progress and increased understanding between Negros and Whites", what the plaintiffs' contention really means is, that a State has no legislative power to preserve peace among its citizens or to pro-

mote, foster and protect the tranquility that has long existed between the White and Negro races within its borders; that the State's attempt to do any of these things is unconstitutional. In the light of the other legislative findings, it also means that a state cannot rule out of its schools teachers who would sow the seed of discord and unrest, which if unimpeded, would blossom into outright strife. It also means that a state cannot keep out of its schools teachers who falsely represent the existence of a disparity in educational advantages among the races that in fact does not exist, and who would subject school children to teachings that are untrue. It also means that a supposedly sovereign state cannot keep out of its schools teachers who would falsely represent conditions of economic and social strangulation to exist, which in fact do not exist. The concluding finding in the statute is that the NAACP " * * * is so insidious in its propaganda and the fostering of those ideas designed to produce a constant state of turmoil between the races, that membership in such an organization is wholly incompatible with the peace, tranquility and progress that all citizens have a right to enjoy." This brings us face to face with matters of serious consequence. We must either conclude that the legislative findings, uncontradicted by any evidence, are untrue, or that the considerations mentioned in the findings are of no legal concern to the people of a state affected thereby, and that any attempt by a state to protect school children from the evil consequences denounced by the statute would be unconstitutional. Such political philosophies presuppose that state governments are the enemies of its citizens. That, to say the least of it, is an un-American concept.

Plaintiffs have not undertaken to disprove the Legislative findings of fact contained in the challenged statute. Hence, I hold, on the authority of the below cited cases, that such findings of fact are conclusive. See: Block v.

Hirsh, 256 U.S. 135, 154, 155, 41 S.Ct. 458, 65 L.Ed. 865; Radice v. People of State of New York, 264 U.S. 292, 294–295, 44 S.Ct. 325, 68 L.Ed. 690; Zahn v. Board of Public Works, 274 U.S. 325, 328, 47 S.Ct. 594, 71 L.Ed. 1074; Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 299 U.S. 183, 195–196, 57 S.Ct. 139, 81 L.Ed. 109; United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234; Chesebro v. Los Angeles County Flood Control District, 306 U.S. 459, 463, 59 S.Ct. 622, 83 L.Ed. 921; Berman v. Parker, 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27.

Garner v. Board of Public Works of City of Los Angeles, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317, cited herein on another point, supports the validity of the State statute. In it at pages 720, 721 of 341 U.S. at page 913 of 71 S.Ct., the Court said:

"* * * We assume that under the Federal Constitution the Charter amendment is valid to the extent that it bars from the city's public service persons who, subsequent to its adoption in 1941, advise, advocate, or teach the violent overthrow of the Government or who are or become affiliated with any group doing so. The provisions operating thus prospectively were a reasonable regulation to protect the municipal service by establishing an employment qualification of loyalty to the State and the United States. Cf. Gerende v. Board of Supervisors of Elections, 1951, 341 U.S. 56, 71 S.Ct. 565 [95 L.Ed. 745]. Likewise, as a regulation of political activity of municipal employees, the amendment was reasonably designed to protect the integrity and competency of the service. This Court has held that Congress may reasonably restrict the political activity of federal civil service employees for such a purpose, United Public Workers [of America (C.I.O.)] v. Mitchell, 1947, 330 U.S. 75, 102–103, 67 S.Ct. 556, 570, 571, 91 L.Ed. 754, and a State is not without power to do as much."

In Adler v. Board of Education of City of New York, supra, The Supreme Court upheld a New York statute and rules promulgated thereunder. The statute made persons associated with organizations found to be subversive *prima facie* ineligible for employment in public schools. The statute made provision for administrative and judicial review for persons adversely affected before any denial of employment or discharge became effective. The Court said, 342 U.S. at pages 491–492, 72 S.Ct. at page 384:

"It is first argued that the Feinberg Law [Education Law, McK. Consol.Laws, c. 16, § 3022 et seq.] and the rules promulgated thereunder constitute an abridgment of the freedom of speech and assembly of persons employed or seeking employment in the public schools of the State of New York.

"It is clear that such persons have the right under our law to assemble, speak, think and believe as they will. American Communications Ass'n [C.I.O.] v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925. It is equally clear that they have no right to work for the State in the school system on their own terms. United Public Workers [of America (C.I.O.)] v. Mitchell, 330 U.S. 75, 67 S. Ct. 556, 91 L.Ed. 754. They may work for the school system upon the reasonable terms laid down by the proper authorities of New York. If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere. Has the State thus deprived them of any right to free speech or assembly? We think not. Such persons are or may be denied, under the statutes in question, the privilege of working for

the school system of the State of New York because, first, of their advocacy of the overthrow of the government by force or violence, or, secondly, by unexplained membership in an organization found by the school authorities, after notice and hearing, to teach and advocate the overthrow of the government by force or violence, and known by such persons to have such purpose."

The State statute that is here assailed does not deprive anyone of the right to belong to the NAACP. It simply prohibits the employment of persons as teachers only so long as they retain membership in the NAACP. Moreover, it operates only prospectively; it places no stigma on past membership in the NAACP. One who is a member may terminate his membership and become eligible for public employment. So also he may assemble with others of like mind and even condemn the statute, as plaintiffs are doing in this case. No penalty attaches to such action.

Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216, cited in a rival opinion, has no application to the present case. There, the Court struck down a State statute which barred from public employment persons who had ever belonged to an organization listed by the Attorney General of the United States as subversive. The rationale of that decision is thus stated by the Court, 344 U.S. 190, 73 S.Ct. 218:

"But membership may be innocent. A state servant may have joined a proscribed organization unaware of its activities and purposes. In recent years, many completely loyal persons have severed organizational ties after learning for the first time of the character of groups to which they had belonged. 'They had joined, [but] did not know what it was; they were good, fine young men and women, loyal Americans, but they had been trapped into it— because one of the great weaknesses of all Americans, whether adult or youth, is to join something.' At the time of affiliation, a group itself may be innocent, only later coming under the influence of those who would turn it toward illegitimate ends. Conversely, an organization formerly subversive and therefore designated as such may have subsequently freed itself from the influences which originally led to its listing."

In the Wieman case, the statute was struck down *because it made past membership in an organization, irrespective of circumstances then or later existing, a bar to public employment.* In the case at bar, the challenged statute makes only existing and continued membership a bar. Yet, the statute has no applicability to this case since no action was or could have been taken under it by the defendants against the plaintiffs.

Nor can it be fairly said that Slochower v. Board of Higher Education of New York City, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692, is applicable here. There, a professor employed at a publicly supported college was discharged because he invoked the Fifth Amendment against self-incrimination while testifying before a United States Senate investigating committee. The discharge was pursuant to a Charter provision of the City of New York. The provision was held unconstitutional after the Court concluded that the exercise of the privilege against self-incrimination was no indication of wrongdoing. Whether or not one agrees with the doctrine of the Slochower case, it has no applicability to the facts of this case.

The statute before us is based upon unchallenged findings of fact by the State Legislature that clearly have a rational basis. Indeed, if the statute has any bearing on constitutional liberties, it protects rather than limits them. The statute is designed to protect young minds from the poisonous effects of NAACP propaganda. It does not, as is

surmised, *outlaw* membership in the NAACP. It doesn't even attempt to do so. It only prevents its members from carrying their programs into the classrooms of public schools, where it is deemed to be against the public interest to have them do so.

There is nothing in the Federal Constitution that denies a state the right to deal legislatively with its own local and domestic problems. The Tenth Amendment too often ignored in recent years, plainly and clearly declares that, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." It is equally plain and clear that the power to dictate the terms upon which public schools may be operated by the states was not by the Constitution delegated to the United States or to its judges. It is also equally clear that there is nothing in the Constitution which denies to the states respectively the power to completely control their established public schools so long as equality of treatment is accorded to the races. And further, there is nothing in the Constitution which says that the equal treatment, required by the Constitution, is itself discrimination and is, therefore, unequal treatment.

It is agreed that no more important duty is imposed upon the Courts than to protect the fundamental rights of all citizens against impairment by the exercise of usurped governmental power. Article VI of the Constitution provides that the Constitution (and this includes the Tenth Amendment), and laws made pursuant thereto, shall be the supreme law of the land; and it binds every judge by oath or affirmation to support the Constitution in all its provisions, even, as I apprehend, against other judges who would usurp the power to change the Constitution or to enact laws by edict to be by them enforced by the coercive misuse of the ancient writ of injunction.

While the purpose of this case, in a sense, is camouflaged, it is not too well hidden. It is to secure this Court's approval of the exercise of a veto power over state legislation dealing with purely local matters. If such is not the aim of this case, why should sixteen plaintiffs, professedly non-members of the NAACP, be lending their names for use in a court battle to install NAACP members or agents in the public schools of the State? The Bible has been ruled out of the public schools. People of State of Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649. The fight here is to rule NAACP's theories of knowledge into them. If that is done, the government or its judges would thereby become invaders of the homes of citizens, superceding the authority and interest of parents in the rearing and training of their children. Knowing the inherent danger in such a vicious procedure, I unhesitatingly register my opposition to it; and may God protect the children of America if the Courts will not and their parents cannot do so.

I conclude: (a) That the undisputed facts of this case, unattended by specious assumptions, clearly warrant the dismissal of the complaint and the entry of judgment for the defendants; (b) That the established facts of this case show that there exists no basis for the exercise of the jurisdiction of a three-judge district court and, for such reason, this Court should be dissolved and the case should be restored to the District Court's regular calendar; and (c) That, failing in agreement as to either (a) or (b) above stated, proceedings herein should be stayed pending state court construction of the challenged statute and determination as to its constitutionality.